**L.L. CAPITAL PARTNERS, L.P., Plaintiff,**

**v.**

**ROCKEFELLER CENTER PROPERTIES, INC., Defendant.**

**No. 95 Civ. 5671 (LAK).**

United States District Court, S.D. New York.

April 16, 1996.

**1176**

Andrew J. Levander, Michael A. Pearce, Shereff, Friedman, Hoffman & Goodman, L.L.P., New York City, for Plaintiff.

Joseph T. McLaughlin, Thomas M. Mueller, Shearman & Sterling, New York City, for Defendant.

## MEMORANDUM OPINION

KAPLAN, District Judge.

This case presents the question whether an issuer engaged in a public offering of securities has an obligation to disclose what fairly might be termed a straw in the wind bearing on the possible future action of a third party which, should that action occur, would have a material impact on the issuer.

In 1993, plaintiff purchased common stock of defendant Rockefeller Center Properties, Inc. ("RCP"), the principal asset of which was a $1.3 billion participating mortgage loan to the owners of Rockefeller Center. RCP disclosed that the property was operating at a substantial deficit which had been funded to that point by affiliates of the borrowers. It disclosed that those affiliates might cease funding the deficit at any point. In 1995, eighteen months later, the affiliates pulled the plug, and the borrowers filed for bankruptcy protection. Plaintiff now claims in essence that RCP should have disclosed a fact which, it says, would have alerted plaintiff to what it characterizes as a likelihood that events would play out in this way, as well as RCP's allegedly "growing belief" that default ultimately was likely. RCP moves to dismiss the complaint on the ground that it fails to state a claim upon which relief may be granted.

### Facts

The well pleaded factual allegations of the complaint are accepted as true for purposes of this motion to dismiss the complaint.

### The Rockefeller Center Mortgage

Rockefeller Center is a commercial development consisting of approximately twelve buildings located in midtown Manhattan and the land on which they are situated. It contains approximately 6.2 million square feet of rentable commercial space and was owned at all relevant times by two partnerships, Rockefeller Center Properties ("RCP Partnership") and RCP Associates ("RCPA"), which are owned and controlled by Rockefeller Group, Inc. ("RGI"). RGI was wholly owned until 1990 by the Rockefeller family, which then sold an 80 percent ownership interest to the Mitsubishi Estate Company, Ltd. ("Mitsubishi") for $1.4 billion. (Cpt ¶ 9)

In July 1985, the Rockefeller family formed and incorporated defendant RCP, a real estate investment trust, to obtain public investment in Rockefeller Center. Shortly thereafter, RCP issued and sold in a public offering $750 million of common stock and $550 million of convertible debentures. (*Id.* ¶ 10) The proceeds of the offering were used by RCP to make a $1.3 billion convertible participating mortgage loan (the "Loan") to RCP Partnership and RCPA (collectively, the "Borrowers"). The Loan is secured by mortgages on Rockefeller Center, matures on December 31, 2007, and is RCP's principal asset. (*Id.* ¶¶ 11–12)

The Borrowers have experienced cash flow shortfalls continuously since 1985 in consequence both of operating cash flow deficits and substantial capital improvements to the property. These deficits were anticipated by RCP from the outset and were expected to continue until September 1994. In order to protect RCP and, presumably, to induce it to make the Loan, the Borrowers arranged in 1985 for the posting of letters of credit (the "LC") in favor of RCP to give assurance that the anticipated deficits would be funded. The LC was issued in the original amount of $126 million and was scheduled to decline in

1993 and 1994. In 1993, however, as part of the settlement of a class action, the Borrowers increased the amount of the LC to $200 million and delayed the scheduled decline until May 1995. (*Id.* ¶ 13)

The deficits historically were funded by Mitsubishi and the Rockefellers through capital contributions, loans and non-interest bearing advances to the Borrowers. But the deficits were not expected to continue indefinitely. Approximately 47 percent of the total rental space in Rockefeller Center was scheduled to be up for renewal in October 1994, when existing leases expired. The hope and expectation in 1985 was that the new or renewed leases would be at much higher rentals and thus generate positive cash flow for Rockefeller Center. (Cpt ¶ 14) Thus, both Mitsubishi's and RCP's investments in Rockefeller Center depended heavily on office rental rates in midtown Manhattan being at a profitable level in 1994.

As almost any real estate investor can attest, things do not always work out as planned. So too here. By 1992, the condition of the New York City commercial real estate market had deteriorated to the point that the lease expirations scheduled for late 1994 posed a looming crisis for the Borrowers rather than a prospective windfall. The rental rates predicted in 1985 could not be obtained. According to the complaint, it was clear to the Rockefeller family, Mitsubishi, the Borrowers, and RCP in 1992 and 1993 that the 1994 lease expirations would place Rockefeller Center into negative cash flow, *i.e.*, payments on the Loan and capital expenditures would exceed rental income. As the standard commercial lease is ten years in duration, the Center would be locked in to negative cash flow for five to ten years after the 1994 expirations, so the deficits would continue past September 1994. The $200 million LC, however, protected against any default on the Loan until the first half of 1995. (*Id.* ¶ 15)

*A Concerned RCP Seeks A Solution*

By June 1993, the deficits had grown to $389.4 million. In consequence, advisers to the Rockefeller family and executives of RCP sought to urge Mitsubishi either to restructure the Loan or to acquire RCP and extinguish it. (*Id.* ¶ 16) During the fourth quarter of 1993, they sought to schedule several meetings with Mitsubishi in Tokyo to discuss Mitsubishi's post–1994 intentions and the anticipated insufficiency of the Borrowers' cash flow to service the loan beyond September 1994. Mitsubishi, according to the complaint, "rebuffed RCP's efforts to obtain such a meeting." (*Id.* ¶ 17) RCP, the complaint alleges, had a "growing belief, based on its communications with the Borrowers, that Mitsubishi and the Rockefeller family were likely, for the very first time since 1985, to cease to fund" the deficits or the Loan. (*Id.* ¶ 16)

*The Offering*

On September 29, 1993, RCP filed a Registration Statement for 3,000,098 shares of common stock subject to issuance on the exercise of warrants issued in settlement of a class action. (*Id.* ¶ 18; Registration Statement (McLauglin Aff.Ex. B) at 6) The exercise price was the greater of $7 per share or the average price during a pricing period less 12 percent. (Cpt ¶ 18)

The Registration Statement plainly disclosed the circumstances of the Borrowers and the uncertainty of continued coverage of the deficits by Mitsubishi and the Rockefellers.[1] In a section captioned "Financial Condition Of The Borrower," it said:

"The Borrower has incurred a substantial cash flow shortfall since the inception of the Loan in 1985 . . . . At June 30, 1993, this cumulative cash flow shortfall amounted to $389.4 million and has been funded by capital contributions to the Borrower . . ., loans from its partners . . . and non-interest bearing advances from an affiliate. *However, it is the Company's understanding that the partners of the Borrower are*

---

1. The Registration Statement is properly before the Court on this Rule 12(b)(6) motion in view of the fact that it is integral to the complaint. *E.g., San Leandro Emer. Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc.,* 75 F.3d 801, 808–09 (2d Cir.1996). The Court declines, however, to treat the newspaper article tendered by defendant as part of the record on this motion, which is addressed to the face of the pleading.

*not required to continue to fund the Borrower's cash flow shortfalls and they might cease to do so at any time.*" (Registration Statement at 8) (emphasis added)

It stated also that RCP would have recourse only to the property in the event of default. (*Id.* at 7)

In December 1993, plaintiff, after attempting to assess whether Mitsubishi and the Rockefeller family would continue to subsidize the Borrowers' unprofitable position in Rockefeller Center, purchased 700,000 shares pursuant to the Registration Statement for approximately $5 million. (*Id.*)

*Subsequent Events*

In or about October 1994, the Borrowers advised RCP that it anticipated that they would breach, for 1994, the covenant in the loan agreement requiring that their net operating income for any calendar year be at least 80 percent of the base interest payable on the Loan and that they had experienced significant cash shortfalls and expected to continue to do so. They restated their 1993 financial statements to indicate that these cash shortfalls raised substantial doubt about their ability to continue as a going concern. RCP reported these events in its Quarterly Report on Form 10–Q for the quarter ended September 30, 1994 and added that it was "unlikely that the Borrower[s] will be able to fulfill all financial commitments to [RCP] under the Loan Agreement for the foreseeable future from [their] own resources." (*Id.* ¶¶ 20, 24; McLaughlin Aff. Ex. C, at 9)

In December 1994, following the restatement of the Borrowers' 1993 financial statements, RCP secured a $214.4 million capital infusion from Whitehall Real Estate Investment L.P.V. and Goldman Sachs Mortgage Company, allegedly on terms less generous to RCP than plaintiff's investment. (*Id.* ¶¶ 26–27)

On or about May 11, 1995, RCP Properties and RCPA, the Borrowers, each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. They thereupon ceased all payments to RCP on account of the Loan. (*Id.* ¶ 28)

*Discussion*

The complaint alleges claims under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), Rule 10b–5 thereunder, 17 C.F.R. § 240.10b–5, and Section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l* (2), as well as common law fraud. It asserts that the Registration Statement improperly failed to disclose ꞏ that (a) RCP was aware that Mitsubishi and the Rockefeller family were likely to cease funding the deficits or the Loan, (b) the Borrowers therefore were likely to default on the Loan in the foreseeable future, (c) RCP was urging Mitsubishi to acquire RCP or restructure the Loan, and (d) Mitsubishi during the fourth quarter of 1993 had rebuffed RCP's attempts to enter into discussions regarding their future relationship. (*Id.* ¶¶ 18, 25) It alleges also, in conclusory fashion, that RCP knew or should have known prior to December 1993 all of the facts that were disclosed in the September 1994 10–Q, which of course cannot literally be true. For example, RCP could not have known before December 1993 that the Borrowers restated their financial statements in October 1994. Accordingly, the allegation must be construed to mean that RCP allegedly knew before December 1993 that the Borrowers were likely to experience the cash shortfalls that later came to pass, to breach the loan covenant for 1994, and to be unable to meet their obligations. Defendant's motion, so far as is significant to this decision, raises essentially two issues, the materiality of the information allegedly withheld and whether plaintiff has pleaded fraud with the particularity required by FED.R.CIV.P. 9(b).

*Materiality*

The Registration Statement here disclosed that Mitsubishi and the Rockefeller family were under no obligation to continue to fund the deficits and might cease to do so at any time. Plaintiff points to no statement indicating either that Mitsubishi and the Rockefellers intended, or that RCP believed that they intended, to do so. Hence, the case is one involving solely omissions. And it is useful at the outset to focus on the fact that it involves two different sorts of omissions. The first concerns a matter of alleged opinion—RCP's alleged belief that Mitsubishi

and the Rockefellers would stop funding the deficits at some point in the future.[2] The second concerns historical facts—that RCP wished to urge restructuring of the Loan or acquisition of RCP by Mitsubishi, but that Mitsubishi had declined its request to meet.

One other preliminary point warrants note. "The sources of a person's duty to disclose information under the federal securities laws are found either in express mandates of the statutes and rules promulgated under them or in the general antifraud provisions of the statutes and rules," including Rule 10b–5. Brudney, *A Note on Materiality and Soft Information Under the Federal Securities Laws*, 75 VA.L.REV. 723, 726 (1989) (footnotes omitted) (hereinafter *Soft Information*). In this case, there is no claim that the defendant was obliged to disclose any of the matters at issue pursuant to the "express mandates" of the laws and regulations. The focus is solely on Rule 10b–5 and Section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l* (2), which in all respects material to this motion is coextensive with Rule 10b–5.

*RCP's Alleged Belief that Funding Would Cease*

The Court accepts for purposes of this motion the complaint's allegations that RCP, at the time of the offering, had a "growing belief" that the funding would stop and had "grown concerned about Mitsubishi's unwillingness to fund the Deficits ..." (Cpt ¶¶ 18, 25) Similarly, it assumes that RCP believed it likely that the Borrowers would be unable to meet their obligations and would breach the loan covenant for 1994 if the funding of the deficits ceased. But RCP's subjective worries, concerns, and beliefs were not a matter requiring disclosure.

Rule 10b–5 provides in pertinent part that it shall be unlawful "[t]o make any untrue statement *of a material fact* or to omit

to state *a material fact* necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b) (1995) (emphasis added). In consequence, "the law mandates disclosure only of existing material facts. It does not require an insider to volunteer any economic forecast." *Harkavy v. Apparel Industries, Inc.*, 571 F.2d 737, 741 (2d Cir.1978) (quoting *Arber v. Essex Wire Corp.*, 490 F.2d 414, 421 (6th Cir.), *cert. denied*, 419 U.S. 830, 95 S.Ct. 53, 42 L.Ed.2d 56 (1974)); *accord, e.g., SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 848 (2d Cir.1968) (en banc), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969); *see also Consolidated Gold Fields PLC v. Anglo American Corp.*, 713 F.Supp. 1457, 1470 (S.D.N.Y.), *aff'd in part, rev'd in part on other grounds sub nom. Consolidated Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252 (2d Cir.), *cert. dismissed*, 492 U.S. 939, 110 S.Ct. 29, 106 L.Ed.2d 639 (1989) ("company is not required to engage in 'educated guesses or predictions' ").

Here, the Registration Statement accurately disclosed the existence of the deficits, the prior funding by Mitsubishi and the Rockefellers, the lack of any obligation on their part to continue to fund the deficits, and the risk that they might cease to do so at any time. If, notwithstanding this disclosure, RCP had indicated optimism that funding would continue, it might well have been required to disclose its subjective belief that the funding would cease because the omission of that information would have made the expression of optimism false or misleading.[3] But there was nothing of the sort here.

To be sure, a case can be made for the proposition that the securities laws should require disclosure of an issuer's opinion as to the likelihood of important future contingencies. *See generally Soft Information*, 75 VA. L.REV. at 728–53 & n. 20. But that is not

---

**2.** Plaintiff refers also to RCP's failure to disclose that the Borrowers were likely to default if Mitsubishi and the Rockefellers failed to fund the deficits. This, however, was perfectly obvious on the face of the Registration Statement. (Registration Statement at 7–9)

**3.** The proper analysis in such circumstances would be that RCP's subjective state of mind itself is a fact. While RCP has no obligation to disclose its state of mind, its description of that state of mind, should it voluntarily elect to disclose it, is a representation of fact. Accordingly, once it elects to make such a statement, it must do so fully and accurately.

now the law. RCP was not required to disclose its predictions and speculations, and they were not a material fact disclosure of which was necessary to make the Registration Statement "not misleading."

*RCP's Desire to Explore Restructuring or an Acquisition*

■ The complaint fairly alleges that RCP had decided, in view of the mounting deficits and the looming expiration of the letter of credit, to explore restructuring the Loan or an acquisition of RCP by Mitsubishi. The allegation that its failure to disclose that fact violated the securities laws invokes the body of law dealing with the circumstances in which issuers are obliged to disclose future contingencies, particularly possible mergers and acquisitions and other transforming transactions.

In *Basic Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), the Supreme Court granted *certiorari* to resolve, *inter alia*, a conflict among the circuits as to the standard of materiality applicable to preliminary merger discussions. Although some courts previously had held that preliminary merger discussions are immaterial as a matter of law prior to the conclusion of an agreement in principle, the Court rejected that approach in favor of the Second Circuit's view that "materiality 'will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.'" *Id.* at 238, 108 S.Ct. at 987 (quoting *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d at 849). It turns upon whether "'the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *Basic Inc.*, 485 U.S. at 231–32, 108 S.Ct. at 983 (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)). In light of this standard, both elements of the *Basic Inc.* test require careful consideration in this case.

The most difficult hurdle for plaintiff is with the likelihood component of the *Basic Inc.* test. This complaint alleges only that RCP "*sought* in 1993 *to urge* Mitsubishi" either to restructure the Loan or to acquire RCP (cpt ¶ 16) (emphasis added), not that it had done so, much less that Mitsubishi had indicated even the slightest interest in either possibility.

*Basic Inc.* indicated that "[w]hether merger discussions in any particular case are material ... depends on the facts." 485 U.S. at 239, 108 S.Ct. at 987. One must look to "indicia of interest in the transaction at the highest corporate levels" among other factors. *Id.* And while even tentative discussions of possibly transforming corporate events in some circumstances may be material, the same cannot be said of the unrequited desire of one party to engage in a transaction with another.

*Panfil v. ACC Corp.*, 768 F.Supp. 54 (W.D.N.Y.), *aff'd*, 952 F.2d 394 (2d Cir.1991) (table), is directly in point. The complaint in that case alleged that the defendants had violated the securities laws by failing to disclose that ACC "intended to pursue Rochester Telephone Company to facilitate a combination of these businesses." *Id.* at 58. The District Court granted a motion to dismiss the complaint on the ground that ACC's desire, which had not yet resulted even in discussions with RTC, was immaterial as a matter of law. It held that "[t]he mere 'intention' to pursue a possible merger at some time in the future, without more, is simply not a material fact under rule 10b–5. The probability of merger prior to any contact with potential suitors—prior to any evidence that a suitor is in any way interested in a merger—is too remote." *Id. See also Glazer v. Formica Corp.*, 964 F.2d 149, 155 (2d Cir.1992) (mere receipt of acquisition overture not necessarily material); *Taylor v. First Union Corp. of South Carolina*, 857 F.2d 240, 244–45 (4th Cir.1988), *cert. denied*, 489 U.S. 1080, 109 S.Ct. 1532, 103 L.Ed.2d 837 (1989) (merger discussions contingent, *inter alia*, on legislative changes immaterial as a matter of law).

Here, the likelihood of a deal with Mitsubishi, given the existence only of RCP's desire to explore such a possibility, was so speculative that RCP's desire was immaterial as a matter of law irrespective of the unquestioned importance of such a transaction were

it to have occurred. And if there were any doubt as to the materiality of RCP's wish, which there is not, it would be removed by consideration of the limited incremental importance of disclosure of RCP's wish.

One must assume for purposes of this motion that an acquisition of RCP by Mitsubishi or a restructuring of the Loan, its principal asset, would have been events of enormous significance. Nevertheless, RCP's wish to explore those possibilities, had it been disclosed explicitly at the relevant time, would have been significantly less than a bolt from the blue. The Registration Statement disclosed that the cumulative deficits by June 30, 1993 had reached almost $400 million, that Mitsubishi and the Rockefellers were not obliged to continue to fund them, and that they might cease doing so at any time. It disclosed too that RCP's only recourse in the event of default would be to the property. In consequence, any rational reader of the Registration Statement would have known that RCP's only options were to (a) hope that Mitsubishi and the Rockefeller family, which—notwithstanding the considerable philanthropic activities of the latter— are not eleemosynary institutions, would continue to fund these huge deficits absent any obligation to do so, (b) stand by and suffer a default, and (c) explore some extraordinary transaction that offered at least the hope of a way out of its obviously perilous situation. In consequence, while disclosure that RCP wished to explore restructuring or an acquisition would have expanded somewhat the "total mix" of information that had been disclosed publicly, the significance of that expansion is debatable.

In the circumstances, the Court holds that disclosure of RCP's wish to explore restructuring the Loan or an acquisition of RCP by Mitsubishi would not have altered the "total mix" of publicly available information in any important way. This allegedly omitted information therefore was not material.

### Mitsubishi's Refusal to Meet

■■■■ The other allegation to be considered is the assertion that RCP improperly failed to disclose that it "sought to schedule several meetings with Mitsubishi" during the fourth quarter of 1993 "to discuss Mitsubishi's post 1994 intentions," but that Mitsubishi "refused even to meet with RCP to discuss the future of the Properties ..." (Cpt ¶ 17) While the complaint is not clear as to whether Mitsubishi knew of RCP's purpose in seeking the meetings, the Court construes it as alleging in substance that RCP indicated to Mitsubishi that it wanted to discuss what Mitsubishi would do after September · 1994 and that Mitsubishi, knowing that was RCP's purpose, declined to meet.[4]

RCP argues that the fact that Mitsubishi declined to meet with RCP in the last quarter of 1993 "says nothing about the intentions of the Rockefeller family" and "could not have provide[d RCP] with any degree of knowledge—much less knowledge with sufficient certainty to trigger ... disclosure obligations—that Mitsubishi would cease funding the Borrowers' cash shortfalls." (Def.Reply Mem. 6–7) Plaintiff, on the other hand, leaps directly to the conclusion that Mitsubishi's action reflected an "apparent decision to cease funding the Deficits" (Pl.Mem. 11), a conclusion the accuracy of which is less than self-evident. Neither side, however, devotes much attention to analyzing the materiality of the simple and unequivocal fact of the alleged refusal to meet.

What do we know? The complaint alleges that RCP and Mitsubishi "historically had maintained close relations" prior to the meeting rebuff. (Cpt ¶ 17) The existence of a large and common problem attributable to the unexpected drop in the New York real estate market and its enormous negative impact on Rockefeller Center are clear. Nevertheless, the refusal to meet in those circumstances could have meant any of a number of things. Perhaps Mitsubishi had

---

4. Contrary to defendant's suggestion, there is nothing to be made of the fact that the Registration Statement was filed on September 29, 1993, whereas the complaint alleges that the efforts to meet with Mitsubishi occurred on unspecified dates during the fourth quarter. Although the efforts had not yet occurred, and therefore could not have been disclosed, at the time the Registration Statement was filed, RCP was under a duty to update its prior statements while the Registration Statement was effective. *SEC v. Manor Nursing Ctrs., Inc.,* 458 F.2d 1082, 1095 (2d Cir.1972); *see also In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 267–68 (2d Cir.1993).

not yet decided what it wished to do. Perhaps it knew its own objective, but felt that it was not in a position to discuss the situation until it first had come to an understanding with the Rockefeller family. Perhaps, as plaintiff readily assumes, it already had decided to cease funding the deficits and did not wish to bear ill tidings. Perhaps too the refusal reflected no more than the unavailability of the relevant personnel at times RCP proposed. No doubt there are other possibilities. The key point, however, is that there is no allegation in this complaint that RCP knew why Mitsubishi had declined to meet.

■ As noted above, there is no suggestion that RCP was obliged to disclose Mitsubishi's refusal by explicit mandate of the securities laws and regulations. Disclosure was required if, and only if, it was necessary to make the statements that RCP had made "not misleading." This turns on the familiar *TSC Industries* test quoted above, whether "there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information available.'"[5] *In re Time Warner Inc. Securities Litigation,* 9 F.3d 259, 267–68 (2d Cir.1993) (quoting *TSC Industries, Inc.,* 426 U.S. at 449, 96 S.Ct. at 2132), *cert. denied,* —— U.S. ——, 114 S.Ct. 1397, 128 L.Ed.2d 70 (1994). As the Registration Statement disclosed that Mitsubishi and the Rockefellers might cease funding at any time, the question is whether knowledge of the refusal to meet would have increased one's assessment of the likelihood that they might do so, notwithstanding the inherent ambiguity of that fact.

The parties have cited no case directly in point, and the Court has found none. The issue seems closely related, however, to another problem affecting materiality, the question whether a particular piece of information is sufficiently specific to be material. *See generally* 2 ALAN R. BROMBERG & LEWIS D. LOWENFELS, BROMBERG AND LOWENFELS ON SECURITIES FRAUD AND COMMODITY FRAUD § 7.4(333) (2d ed. 1994) (hereinafter BROMBERG); 3 *Id.* §§ 7.5(1041), 7.5(1141). In each case, the question is whether the datum in question conveys sufficient information to be important in the decision-making process.

The cases in this area point in different directions. In *Elkind v. Liggett & Myers, Inc.,* 635 F.2d 156 (2d Cir.1980), the Court of Appeals held, in an insider trading context, that insider confirmation of the company's slowing sales, a trend already generally known in the investment community, unaccompanied by any quantitative information, was not material. *Id.* at 166. In *SEC v. Bausch & Lomb Inc.,* 565 F.2d 8 (2d Cir. 1977), it held that a corporate officer had not disclosed material inside information when he responded to security analysts' suggestions of particular earnings figures by indicating a desire that analysts should be more restrained and by expressing anger at the analysts' aggressive tactics, remarks that the SEC unsuccessfully argued were, and were taken as, comments on the merits of the analysts' estimates. *Id.* at 16–17. *See also SEC v. Monarch Fund,* 608 F.2d 938, 942 (2d Cir.1979) (level of specificity required for tippee liability in insider trading case relates to extent to which information eliminates tippee's investment risk). On the other hand, in *SEC v. Geon Industries, Inc.,* 531 F.2d 39 (2d Cir.1976), the Court of Appeals held that a corporate chief executive officer disclosed material non-public information when he told a friend and associate that he was going to London and that he perhaps would be looking at some people in view of a merger while there. *Id.* at 42, 47–48. And in *State Teachers Retirement Bd. v. Fluor Corp.,* 654 F.2d 843 (2d Cir.1981), the Court of Appeals implicitly held that the disclosure that a $2 billion contract "could go" to a particular bidder was sufficiently definite to raise a jury question as to materiality.

It is difficult to draw from these cases a single all-embracing rule. They illustrate,

---

5. As *Time Warner* makes clear, the questions whether the defendant was under a duty to disclose and whether the omitted fact was material, although quite distinct is some circumstances, coalesce "where the disclosure duty arises from the combination of a prior statement and a subsequent event which, if not disclosed, renders the prior statement false or misleading ..." *In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 267 (2d Cir.1993). That is precisely the situation here.

however, that a great deal turns on context. As one noted author has written regarding insider trading, "[O]ne who trades on hearing a total stranger say 'TGS is a good buy' should not be a violator. But one who trades on being told the same thing by a director of the company, in a tone of a mysterious and emphatic confidentiality, on emerging from a board meeting, may well be a violator." 3 BROMBERG § 7.5(1141), at 7:300.11. And the analogy to this case is reasonably plain.

■ Materiality is a mixed question of law and fact. *TSC Industries, Inc.,* 426 U.S. at 450, 96 S.Ct. at 2132–33. Dismissal on materiality grounds of a complaint alleging misrepresentation or non-disclosure of a fact is appropriate only if the plaintiff could prove no facts under the allegations of the pleading that would permit the trier to find the fact material.

Mitsubishi and the Rockefellers had funded deficits which, by the date in question, aggregated almost $400 million. Nevertheless, the complaint alleges that Mitsubishi and RCP historically had maintained close relations. Thus, while the refusal to meet itself was ambiguous, the trier of fact reasonably might infer that it was something out of the ordinary. Against the background of the alleged relationship among Mitsubishi, RCP and the Rockefeller family, the Court is not prepared to say that it would be unreasonable as a matter of law for a trier of fact to conclude that Mitsubishi's refusal shed enough light on its probable future actions to alter significantly the "total mix" of available information. Accordingly, insofar as the motion seeks dismissal of this aspect of the complaint on the ground that there was no duty to disclose the refusal, or that the refusal was not material, it must be denied.

*Rule 9(b)*

■ RCP has another arrow in its quiver, however. FED.R.CIV.P. 9(b) requires that allegations of fraud be made with particularity. The Rule 10b–5 and state law claims manifestly allege fraud. And while *scienter* is not an essential element of the claim under Section 12(2) of the Securities Act of 1933, this complaint pleads *scienter* as part of that claim (cpt ¶ 32), thus bringing that count within Rule 9(b) as well. *E.g., Neubauer v.*

*Eva–Health USA, Inc.,* 158 F.R.D. 281, 284 n. 1 (S.D.N.Y.1994) (citing cases).

■ It now is established in the Second Circuit that a securities fraud plaintiff must "allege facts that give rise to a strong inference of fraudulent intent" in order to state a legally sufficient claim for relief. *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994). This may be accomplished "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* Accord, e.g., *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 813 (2d Cir.1996); *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 51 (2d Cir.1995); *In re Time Warner Inc. Securities Litigation,* 9 F.3d at 268–69. Plaintiff's brief contends that the complaint satisfies Rule 9(b) on either standard. (Pl.Mem. 11–12)

The complaint manifestly is insufficient under the conscious misbehavior prong of the test. To be sure, it contains conclusory assertions that RCP "willfully and/or recklessly" failed to disclose the facts described above and that it "knew, or was reckless in not knowing, of the material misrepresentations and omissions ..." (Cpt ¶¶ 25, 32, 38, 44) But all of those allegations are made on information and belief (cpt at 1) and none is supported by even a scrap of evidentiary detail. *See Stern v. Leucadia Nat'l Corp.,* 844 F.2d 997, 1003 (2d Cir.), *cert. denied,* 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 109 (1988). The materiality of the one alleged nondisclosure that is sufficient to survive a motion to dismiss is highly debatable, which indicates that the nondisclosure in itself is not a sufficient basis from which to infer conscious misbehavior. In consequence, the conclusory allegations rest on nothing.

Plaintiff does not "enjoy a 'license to base claims of fraud on speculation and conclusory allegations.'" *San Leandro,* 75 F.3d at 813 (quoting *Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2d Cir.1990)). To sustain this complaint on the conscious misbehavior standard would be to confer precisely such a

license. That leaves the question whether plaintiff had a motive and an opportunity to commit fraud by withholding the information concerning Mitsubishi's refusal to meet.

The complaint alleges that RCP in early 1993 began seeking additional capital to replace expiring bank guarantees. (Cpt ¶ 27) Plaintiff's brief argues that the disclosure of Mitsubishi's refusal to meet—which it too aggressively characterizes as its "apparent decision to cease funding"—would have made the terms on which RCP could have raised additional capital less favorable (Pl.Mem. 11), thus giving RCP a motive to conceal. But this assertion is defeated by the Second Circuit's most recent pronouncement on this subject.

In *San Leandro Emergency Medical Group Profit Sharing Plan*, 75 F.3d 801, the plaintiffs complained of Philip Morris' alleged failure to disclose that sales of Marlboro cigarettes, an important product, were declining at an alarming rate and that the company was considering a new discounted pricing strategy to increase market share at the expense of short-term profits. In an effort to establish the motive essential to the second prong of the Rule 9(b) test, they contended that the nondisclosure temporarily sustained the stock price and an illusion of continued profitability, which in turn "maintained the company's bond and credit ratings at the highest possible level so as to maximize the marketability of the $700 million of debt securities issued" during the relevant period. *Id.* at 813. But the Second Circuit dismissed the argument in a single sentence: "We do not agree that a company's desire to maintain a high bond or credit rating qualifies as a sufficient motive for fraud in these circumstances, because '[i]f scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.'" *Id.* at 814 (quoting *Acito*, 47 F.3d at 54). *See also Shields v. Citytrust Bancorp, Inc.*, 25 F.3d at 1130 ("It is hard to see what benefits accrue from a short respite from an inevitable day of reckoning.").

*San Leandro* and *Shields* both were stronger cases for the plaintiffs on this point than this one. In both cases, the issuers had made forward-looking statements with varying degrees of optimism that allegedly were at odds with subsequent events. In both, therefore, the plaintiffs at least could argue with straight faces that the alleged nondisclosures kept the market from learning of developments inconsistent with the issuers' stated expectations. Here, in contrast, the market well knew, because the Registration Statement disclosed, that the Borrowers were hanging on by their fingernails and that Mitsubishi and the Rockefellers had no obligation to continue funding the deficits. RCP said absolutely nothing to suggest that they would continue to fund. If the concealment of information at variance with management's stated expectations is insufficient to give rise to an inference of fraud, *a fortiori* the failure to disclose Mitsubishi's refusal to meet in the circumstances of this case is insufficient. Accordingly, the complaint fails to allege fraud with the particularity required by FED.R.CIV.P. 9(b).

### Conclusion

For the foregoing reasons, defendant's motion to dismiss the complaint is granted in all respects.

SO ORDERED.