Robert BELESON et al., Plaintiffs,

v.

Bernard SCHWARTZ, Defendant.

No. 03 CV 6051 (VM).

United States District Court,
S.D. New York.

Feb. 24, 2009.

Fred T. Isquith, Wolf, Haldenstein, Freeman, Adler & Herz, L.L.P., Menachem E. Lifshitz, Bernstein Liebhard, LLP, Joseph Harry Weiss, Weiss & Lurie, Christopher Scott Hinton, The Hinton Law Firm, New York, NY, for Plaintiffs.

Francis James Menton, Jr., Jeanne Marie Luboja, Willkie Farr & Gallagher LLP, New York, NY, for Defendant.

## DECISION AND ORDER

VICTOR MARRERO, District Judge.

Lead plaintiffs Robert Beleson and Harvey Matcovsky, on behalf of themselves and all others similarly situated (collectively, "Plaintiffs"), brought this class action against defendant Bernard Schwartz ("Schwartz" or "Defendant"), alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a) (the "Exchange Act"), and Securities and Exchange Commission ("SEC") Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5 ("Rule 10b–5"). Schwartz filed a motion for summary judgment seeking dismissal of Plaintiffs' claims. Plaintiffs filed a cross-motion for partial summary judgment on the issues pertaining to Schwartz's liability. For the reasons set forth below, the Court GRANTS Schwartz's motion for summary judgment, and DENIES Plaintiffs' cross-motion for partial summary judgment.

## I. BACKGROUND [1]

Plaintiffs represent a class of individuals who purchased securities of Loral Space & Communications, Ltd. ("Loral" or the "Company") from June 30, 2003 through July 15, 2003 (the "Class Period"). Loral was a satellite communications company with substantial activities in manufacturing and satellite-based communications services.[2] Schwartz was Loral's Chief Execu-

---

1. The factual summary that follows is based primarily on the following documents: Plaintiffs' Class Action Complaint, dated August 11, 2003 ("Complaint"); Defendant's Answer, dated March 2, 2004 ("Answer"); Defendant's Statement of Undisputed Material Facts Pursuant to Rule 56.1, dated July 21, 2008 ("Def.'s Stmt."); Plaintiffs' Responses to Defendant's Statement, dated September 22, 2008; Plaintiffs' Statement of Undisputed Material Facts Pursuant to Rule 56.1, dated September 22, 2008 ("Pls.' Stmt."); Defendant's

Reply to Plaintiffs' Statement, dated October 22, 2008; and the affidavits in support of the motions for summary judgment filed by Plaintiffs and Defendant. Except where specifically referenced, no further citation to these sources will be made.

2. Loral is not a named defendant in this action because it voluntarily entered into Chapter 11 bankruptcy on July 15, 2003, which closed the Class Period. Loral emerged from bankruptcy on November 11, 2003 and re-

tive Officer and the Chairman of its Board of Directors in 2002 and 2003.

In early 2003, Loral was experiencing severe financial difficulties and had approximately $2.2 billion in outstanding debt, including $1 billion in bank loans from syndicates headed by Bank of America (the "Syndicates") and $1 billion in bonds from its subsidiary, Loral Orion, Inc. ("Orion"). In the beginning of 2003, Loral began exploring a variety of ways to improve its struggling financial condition. To this end, Loral hired the investment bank Greenhill & Co. ("Greenhill") to help restructure its bank debt and to find possible merger partners. Harvey Miller ("Miller"), who was then the Managing Director and Vice Chairman at Greenhill, was part of the Greenhill team. Although Miller had previously created the Business Finance and Restructuring department at Weil Gotshal & Manges LLP ("Weil Gotshal"), the terms of Loral's retention of Greenhill made no reference to bankruptcy.

In early 2003, Intelsat Ltd. ("Intelsat") surfaced as a potential buyer of at least some of Loral's satellites. In March 2003, Loral personnel met with Intelsat's financial advisor to discuss the due diligence required for Intelsat to consider purchasing six of Loral's North American satellites (the "Intelsat Satellite Sale"). Initially, Intelsat's internal analysis of a potential deal with Loral did not require Loral to file for bankruptcy. In May 2003, however, Intelsat began demanding a bankruptcy filing to assure the safe passage of title to the satellites. By May 12, 2003,

Schwartz understood that in order for the Intelsat Satellite Sale to proceed, "Intelsat required a bankruptcy." (Affidavit of Francis J. Menton, Jr., dated July 21, 2008 ("Menton Aff."), Ex. 2 at 151–52.) At a special meeting of Loral's Board of Directors on May 27, 2003, Schwartz discussed the possibility of completing the Intelsat Satellite Sale as part of a prepackaged bankruptcy. On May 30, 2003, Loral and Intelsat agreed that the Intelsat Satellite Sale, if finalized, would be completed through a sale of property pursuant to 11 U.S.C. § 363(b). Loral retained Weil Gotshal; KPMG; and Conway, Del Genio, Gries & Co., LLC to assist, in the event that Loral did, in fact, file for bankruptcy. Loral, however, hoped to avoid filing for bankruptcy and actively pursued alternatives to the Intelsat Satellite Sale.[3]

On June 24, 2003, Loral provided the Syndicates with a cash flow forecast that "assume[d] the potential commencement of reorganization cases within the next 7–30 days." (Affidavit of Julia J. Sun, dated September 22, 2008 ("Sun Aff."), Ex. 15.) In addition, Loral settled its outstanding arbitration claims with Alcatel Space Industries and Alcatel Space (collectively, "Alcatel"), and Loral informed Alcatel on June 25, 2003, that Alcatel should "go forward with the settlement ... on the assumption that the Loral entities would file for bankruptcy within the next ninety days." (*Id.*, Ex. 16.) Despite these representations, it was unclear at this time whether Loral and Intelsat would reach an agreement. As of June 30, 2003, the first day of the Class Period, "there remain[ed]

---

formed as Loral Space & Communications Inc.

**3.** In February and March of 2003, Loral was considering other options, including exchanging equity for bonds outstanding, exchanging bonds for new bonds with a different interest rate and different maturities, selling some of

Loral's assets to other buyers, selling Loral's investment in stock of Sirius Satellite Radio Inc., selling orbitals, entering into joint ventures, selling part of Loral's fixed satellite services fleet, and selling part of Loral's equity. (*See* Menton Aff., Ex. 2 at 28–29.)

outstanding items" for due diligence. (Menton Aff., Ex. 40 at IN 000137.)

From June 30, 2003 through July 12, 2003, Intelsat continued to raise questions about various Loral assets and sought changes to fundamental aspects of the proposed deal, including the price that Intelsat would pay for the satellites. Although Intelsat had initially offered $1.1 billion, as a result of its due diligence it lowered its offer price to $950 million, which according to Richard Townsend, Loral's Executive Vice President and Chief Financial Officer during the Class Period, Loral would not have accepted because that amount would not have been enough to pay the Syndicates in full. By July 8, 2003, the parties were still $150 million apart on the purchase price of the satellites.

On July 12, 2003 and July 13, 2003, Loral and Intelsat executives, including Schwartz, participated directly in a series of face-to-face negotiations. According to Intelsat's Chairman, the negotiations were characterized by "intense and still sometimes contentious discussions to the very end." (*Id.*, Ex. 5 at 116.) At the close of the negotiations, Intelsat raised its offer price above $1 billion, and the parties finally reached an agreement. On July 14, 2003, Loral's Board of Directors approved the Intelsat Satellite Sale along with the bankruptcy filing. On July 15, 2003, Loral and Intelsat signed an Asset Purchase Agreement in which Intelsat ultimately agreed to pay $1.06 billion for the satellites, and Loral filed for Chapter 11 bankruptcy. Before the market opened that day, Loral announced the Intelsat Satellite Sale and its Chapter 11 bankruptcy filing, a precondition to the sale. Plaintiffs allege that, as a result of the bankruptcy filing, the price of Loral common stock dropped from its closing price of $3.01 per share on July 14, 2003, the day before the bankruptcy announcement, to a low of just 30 cents on July 16, 2003, when the stock resumed trading on the over-the-counter market.

On August 11, 2003, Plaintiffs filed this class action asserting claims under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b–5. Plaintiffs allege that four fraudulent statements were made during the Class Period, giving rise to their claims [4]:

(1) a June 30, 2003 press release in which Loral announced that it had "reached an overall settlement with Alcatel resolving all outstanding issues between them including a contract dispute that has been in arbitration" ("Statement 1");

(2) a June 30, 2003 press release in which Loral stated that it had "collected approximately $55 million from Intelsat representing an acceleration of a receivable for agreed-upon milestone performance payments" ("Statement 2");

(3) a July 1, 2003 *Reuters* article quoting Schwartz as stating that Loral was "on plan" to have $65 million in

---

4. In their summary judgment papers, Plaintiffs complain of additional statements made before the Class Period. At the November 17, 2003 oral argument regarding the appointment of lead plaintiff in this action, the Court asked Plaintiffs if they claimed misrepresentations made before the Class Period, and Plaintiffs responded that "[w]e claim the misrepresentations began on June 30." (Transcript of Oral Argument, dated November 17, 2003, at 9–10.) The Court allowed another lawsuit to proceed based upon disclosures made before June 30, 2003, *In re Loral Space & Comm's S'holders' Secs. Litig.*, No. 03–CV–8262. On October 8, 2008, the Court preliminarily approved the settlement of that matter, including approval of a provision barring other claims based on the pre-June 30, 2003 statements in the *Loral* class period. Therefore, the Court will not ground liability in this class action on any statements made before June 30, 2003, the beginning of the Class Period.

cash at the end of the year ("Statement 3"); and

(4) a July 8, 2003 press release in which Loral's subsidiary, Space Systems Loral ("SSL"), announced that it had "won a contract from Boeing NASA Systems, Houston, Texas, to build 40 replacement batteries for ... the International Space Station" ("Statement 4").

(*See* Pls.' Stmt. ¶¶ 27, 125–26, 128–29.)

The truth of these statements is not in dispute.[5] Rather, Plaintiffs argue that these statements were misleading as to Loral's viability because Loral failed to disclose that it was negotiating a deal with Intelsat which, if agreed upon, would have required Loral to file for bankruptcy. (*See* Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment and in Support of Plaintiffs' Cross–Motion for Partial Summary Judgment, dated September 22, 2008 ("Pls.' Mem."), at 12–13.) Plaintiffs allege that Schwartz, because of his position at Loral, controlled and/or possessed the power and authority to control the contents of the press releases at issue in this case. Plaintiffs allege that Schwartz engaged in a course of conduct aimed at: (1) deceiving the investing public by making false statements and omissions of material fact; (2) artificially inflating and maintaining the market price of Loral securities; and (3) causing Plaintiffs and other members of the class to purchase Loral securities at artificially inflated prices and to suffer damages after Loral filed for bankruptcy.

## II. DISCUSSION

### A. LEGAL STANDARD

 Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when the evidence "show[s] that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* at 248, 106 S.Ct. 2505. A factual dispute is genuine when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* The role of a court in ruling on such a motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986). The moving party bears the

---

**5.** With respect to Statement 1, Loral had been involved in an International Chamber of Commerce arbitration with Alcatel. On June 30, 2003, the parties agreed to settle all claims between them, including the arbitration claims brought by Alcatel against Loral, for $13 million. With respect to Statement 2, when Loral sold a satellite to a customer, it received orbitals, or periodic performance payments made by the customer over the life of a satellite. As announced, Loral, in a separate and independent deal from the Intelsat Satellite Sale, sold orbitals to Intelsat for $55 million. The forecast in Statement 3 was based on projections that SSL would receive five satellite orders in 2003. Even assuming

the Reuters article correctly quoted Schwartz's comment, this statement was correct, as Loral ended the year of 2003 with over $140 million in cash on hand. With respect to Statement 4, Loral did win a contract to build forty replacement batteries for the International Space Station at a cost of $108 million.

Because the $13 million settlement with Alcatel, the $55 million sale of orbitals to Intelsat, and the $108 million contract from Boeing NASA Systems were "material definitive agreements" entered into outside the ordinary course of business, *see* 17 C.F.R. § 240.13a–11, Loral was required to disclose these transactions.

burden of proving that no genuine issue of material fact exists, or that because of the paucity of evidence presented by the non-movant, no rational jury could find in favor of the non-moving party. *See Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1223–24 (2d Cir.1994). When deciding cross-motions for summary judgment, the standard to be applied "is the same as that for individual summary judgment motions and a court must consider each motion independent of the other." *Schultz v. Stoner*, 308 F.Supp.2d 289, 298 (S.D.N.Y.2004) (internal quotation marks and citation omitted).

## B. *APPLICATION*

### 1. *Plaintiffs' Claims Under Section 10(b) of the Exchange Act and Rule 10b–5*

Both parties move for summary judgment on Plaintiffs' claims under Section 10(b) of the Exchange Act and Rule 10b–5. Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). Rule 10b–5 prohibits "mak[ing] any untrue statement of a material fact ... or [omitting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. 240.10b–5.

■ In order to establish liability under Section 10(b) and Rule 10b–5, a "plaintiff must establish that 'the defendant, (1) in connection with the purchase or sale of securities, (2) made a materially false statement or omitted a material fact, (3) with scienter, and (4) that the plaintiff's reliance on the defendant's action (5) caused injury to the plaintiff.' " *Lawrence*

*v. Cohn*, 325 F.3d 141, 147 (2d Cir.2003) (*quoting Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir.2000)); *see also Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 534 (2d Cir.1999) (establishing the same formula for stating a claim under Rule 10b–5). An omitted fact is material if there is a "substantial likelihood that [its disclosure] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). The "total mix" of information includes information "reasonably available" to investors. *See, e.g., United Paperworkers Int'l Union v. International Paper Co.*, 985 F.2d 1190, 1198 (2d Cir.1993); *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F.Supp.2d 148 (S.D.N.Y.2008) (citing analysts' reports "to show whether and when information was provided to the market such that the reports contributed to the total mix of information available to investors" (internal quotation marks and citation omitted)).

In this case, the parties contest: (1) whether Schwartz made a misrepresentation or omission of material fact; (2) if so, whether the Class Period statements were immune from liability under the "safe harbor" provision of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u–4 ("PSLRA"); and (3) whether Schwartz acted with intent to deceive the market.

■ The truth of the four Class Period statements is not in dispute. Instead, Plaintiffs' claim that these statements were misleading because Loral failed to disclose that it was negotiating a deal with Intelsat which, if agreed upon, would have required Loral to file for bankruptcy.

■ It is clear that "[a] corporation is not required to disclose a fact merely be-

cause a reasonable investor would very much like to know that fact." *In re Time Warner, Inc. Secs. Litig.*, 9 F.3d 259, 267 (2d Cir.1993). Rather, an omission is actionable only when the corporation is subject to a duty to disclose the information. *See id.* A duty to disclose "arises when disclosure is necessary to make prior statements not misleading." *Id.* at 268. Plaintiffs argue that Loral's failure to disclose its bankruptcy planning rendered the Class Period statements misleading, because these statements implied that Loral "was viable and was 'on plan' to remain viable." (Pls.' Mem. at 12–13.)

Even viewing these facts in the light most favorable to Plaintiffs, the Court finds that Loral's failure to disclose its bankruptcy planning did not render the Class Period statements misleading as to Loral's viability. Schwartz has submitted extensive evidence that, throughout the Class Period, Loral put the market on notice of its dire financial circumstances. Given the severity of the conditions Loral reported, that the company would end up filing a petition in bankruptcy was not a prospect outside the realm of possibilities that the securities markets would have anticipated, or that reasonable investors would have guarded against. For example, Loral's 2002 10–K filing disclosed losses of $66,218,000 in 2000; $150,565,000 in 2001; and $502,396,000 in 2002; and a decline in cash reserves from $159,949,000 in 2001 to $65,936,000 in 2002. (*See* Menton Aff., Ex. 12 at F3–F4.) In its proxy statement filed on April 18, 2003, Loral advocated a one-to-ten reverse stock split in order to maintain its listing on the New York Stock Exchange ("NYSE").[6] (*Id.*, Ex. 14 at 9.) Even with a reverse split, Loral warned that the Company and its subsidiaries "have a significant amount of outstanding debt and guarantee obligations" and that, "[a]s of December 31, 2002, the total amount of ... outstanding consolidated ... debt was approximately $2.2 billion." (*Id.*, Ex. 12 at 13.) Any rational investor reading Loral's SEC filings could determine that, with its outstanding common stock worth only $111 million at the start of the Class Period, Loral's debt was approximately twenty times its equity value. Loral further warned that its stock price was "depressed and may not recover," and that a stumble in Loral's business plan could mean that its "operations might not generate enough cash to pay our obligations." (*Id.* at 14.)

On the record before it, the Court is not persuaded that either before or during the Class Period, the market was misled as to Loral's viability. The average closing price of Loral's common stock was "trading at or near its all-time low price,"[7] (*Id.* at 25), and its bonds were trading at only 20 cents on the dollar. (*Id.*, Ex. 16 at 3, 5.) On April 7, 2003, Lehman Brothers issued a report stating that "Loral's difficulties in an adverse satellite market have been compounded by leverage" and cautioned that "for most investors, we think LOR equity is too speculative (possibly binary outlook)." (*Id.*, Ex. 20 at 1.) On April 21,

---

**6.** The NYSE will consider de-listing a company's stock when the average closing price of the stock is less than $1.00 for 30 consecutive trading days. Loral disclosed that the average closing price of its common stock was less than $1.00 for 30 consecutive trading days, and that, on August 22, 2002, it received notice from the NYSE that its stock price was below the NYSE's price criteria. (*See* Menton Aff., Ex. 12 at 24.)

**7.** On February 1, 2000, the closing price of Loral's common stock was $20.12 per share. By June 30, 2003, the first day of the Class Period, Loral's common stock had plummeted to only $3.05 per share. On July 14, 2003, the day before the bankruptcy announcement, Loral's common stock fell further to only $3.01 per share.

2003, the *Wall Street Journal* noted that Loral's bonds were "junk rated." (*Id.*, Ex. 21 at 1.) On May 19, 2003, *Aviation Week & Space Technology* quoted analysts as predicting that the "heavily leveraged" Loral would be "unable to avoid another Chapter 11 bankruptcy filing." (*Id.*, Ex. 22 at 1.) Indeed, the day after Loral filed for bankruptcy, the Associated Press reported that "analysts were not surprised by the bankruptcy, given the sluggish state of the satellite business and Loral's $2.1 billion in long term debt." (*Id.*, Ex. 7 at 1.)

Plaintiffs cite two cases in support of their argument that courts have found statements regarding a company's financial condition materially misleading because the company failed to disclose imminent bankruptcy. (Pls.' Mem. at 18–19 (*citing In re McLeodUSA Inc. Secs. Litig.*, No. 02–CV–001 (N.D.Iowa Aug. 8, 2003) (Mag. Report); *Salkind v. Wang*, No. 93–10912–WGY, 1995 WL 170122 (D.Mass. Mar. 30, 1995)).) In *McLeodUSA*, a magistrate judge in the Northern District of Iowa recommended the denial of a motion to dismiss based on allegations that the company misrepresented its financial results and omitted facts relating to bankruptcy when, according to the complaint, bankruptcy was a certainty. *See McLeodUSA*, No. 02–CV–001, at 19, 23. In *Salkind*, the District of Massachusetts held that statements regarding a company's overall financial strength, viability, and future performance were materially misleading by defendants' omission that "the company was on 'the brink of bankruptcy.'" *Salkind*, 1995 WL 170122, at *4.

These cases are not controlling and are, at any rate, inapposite. In *McLeodUSA*, the complaint alleged that defendants' financial statements were manipulated and fraudulently reported to investors and analysts.[8] By contrast, in the instant case, the truth of the Class Period statements is not in dispute. In *Salkind*, the statements at issue were not made in the context of contrary information available in the market about the company's viability. Here, on the other hand, there was extensive information available in the market regarding Loral's precarious financial condition throughout the Class Period. In addition, neither *McLeodUSA* nor *Salkind* addresses the situation where, as in this case, the company was considering other alternatives and the eventual bankruptcy filing was contingent upon the consummation of a transaction in which the other party demanded such filing as an essential term. Although it was highly likely that Loral would file for bankruptcy during the Class Period in any event, the filing that did occur was still contingent upon Loral and Intelsat coming to a final agreement on the terms of the Intelsat Satellite Sale, and whether the parties would reach an agreement at all remained uncertain "[u]ntil the last second before" the parties signed the Asset Purchase Agreement on July 15, 2003. (Menton Aff., Ex. 5 at 95.)

More directly on point is a case recently decided in this District, *In re Tower Auto. Secs. Litig.*, 483 F.Supp.2d 327 (S.D.N.Y. 2007). In *Tower Auto.*, the plaintiffs claimed that "the very fact that [the company] was making contingency plans for bankruptcy rendered misleading its subsequent public statements, since these statements did not mention bankruptcy." *Id.*

---

**8.** The complaint in *McLeodUSA* alleged that defendants' financial statements were manipulated and fraudulently reported in that they recognized sales and accounts that had been cancelled by customers; recorded a substantial percentage of the reported revenue from fictitious orders and fictitious customers; and back-dated contracts so as to recognize additional revenue at the end of a fiscal quarter.

at 348. The district court disagreed and granted the defendants' motion to dismiss the complaint with respect to claims regarding the company's bankruptcy planning, holding that "failure to disclose its bankruptcy planning did not make . . . other disclosures misleading." *Id.* Instead, defendants' warnings that the company was "pursuing options for easing the company's liquidity problems" provided sufficient disclosure to the market about the company's financial condition. *Id.*; *see also L.L. Capital Partners, L.P. v. Rockefeller Ctr. Props., Inc.*, 921 F.Supp. 1174, 1181 (S.D.N.Y.1996) (granting defendant's motion to dismiss because disclosure of defendant's wish to explore restructuring or an acquisition "would have been significantly less than a bolt from the blue," and thus would not have altered the "total mix" of publicly available information).

Here, as in *Tower Auto.*, the information available to the market, including Loral's 10–K filings and numerous reports from market analysts and reporters, was sufficient to put investors on notice that bankruptcy was a real possibility. Because Loral's failure to disclose its contingent bankruptcy planning did not render the Class Period statements misleading as to Loral's viability, Loral did not have a duty to disclose this information.

Such an outcome is further supported by the public policy justifications for allowing a company operating near insolvency to make careful deliberations about its future, free from any obligation to disclose potential bankruptcy. *See Tower Auto.*, 483 F.Supp.2d at 348 ("No multi-billion dollar company would file for bankruptcy without first engaging in internal deliberations regarding its course of action. . . ."). Any standard mandating disclosure of contingent bankruptcy planning would put an unacceptable burden on corporations and their officers. Such a standard might amount to a self-fulfilling prophecy, ensuring that all companies that begin contingent preparations for bankruptcy would inevitably go bankrupt because, upon disclosure of the plans, investors would immediately lose confidence in the company and close the capital markets. In some cases, a rule requiring disclosure of bankruptcy plans might prematurely foreclose other options the company may be contemplating that could restore its financial viability and thus avert bankruptcy. Such a standard would also raise substantial practical challenges in defining the proper moment during the continuum of contingency planning at which the obligation to disclose would take effect.

Because the Court finds that Plaintiffs have failed to establish that Schwartz made a misrepresentation or omission of material fact, the Court need not address the arguments concerning the PSLRA "safe harbor" provision or Schwartz's alleged intent to deceive to market. The Court therefore grants Schwartz's motion for summary judgment as to Plaintiffs' Section 10(b) and Rule 10b–5 claims, and denies Plaintiffs' motion for summary judgment as to the Section 10(b) and Rule 10b–5 claims.

### 2. *Plaintiffs' Claim Under Section 20(a)*

■ Because the Court has concluded that Schwartz is entitled to summary judgment on the Section 10(b) claim, the control person liability claim under Section 20(a) of the Exchange Act fails for want of a primary violation. *See SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1472–73 (2d Cir.1996) ("In order to establish a prima facie case of controlling-person liability, a plaintiff must show a primary violation by the controlled person"). The Court therefore grants Schwartz's motion for summary judgment as to Plaintiffs'

528

Section 20(a) claim, and denies Plaintiffs' motion for summary judgment as to the Section 20(a) claim.

### III. *ORDER*

For the reasons discussed above, it is hereby

**ORDERED** that the motion (Docket No. 65) for summary judgment of defendant Bernard Schwartz is GRANTED; and it is further

**ORDERED** that the cross-motion (Docket No. 69) for partial summary judgment of lead plaintiffs, Robert Beleson and Harvey Matcovsky, on behalf of themselves and all others similarly situated, is DENIED; and it is further

**ORDERED** that because *In re Loral Space & Comm's S'holders' Secs. Litig.*, No. 03–CV–8262, has been consolidated under this caption and is still pending, the Clerk of the Court shall not close the above-captioned action in the absence of a further order by this Court.

**SO ORDERED.**