Alton C. SCHULTZ, Jr., Elaine B. Jackson, Gladys Criddle, and Harold Weber, Plaintiffs,

v.

Janet L. STONER, Defendant.

No. 00 Civ. 0439(LTS)(MDF).

United States District Court, S.D. New York.

March 8, 2004.

Herman, Herman, Katz & Cotlar, LLP, By: Russ M. Herman, Stephen J. Herman, New Orleans, Louisiana, Slade & Albright, By: Stephen Albright, New York City, for Plaintiffs.

Jackson Lewis Schnitzler & Krupman, By: Elise M. Bloom, Kathryn A. Korger, New York City, O'Melveny & Myers LLP, By: Robert N. Eccles, Evelyn L. Becker, Washington, D.C., Texaco Inc., By: Joseph P. Moan, White Plains, New York, for Defendant.

## OPINION AND ORDER

SWAIN, District Judge.

In this putative class action, brought pursuant to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), individuals who provided services to Texaco, Inc. or one or more of its affiliates (collectively, "Texaco") while on the payrolls of certain third-party entities with which Texaco had contracted claim that they and others similarly situated [1] were the victims of breaches of fiduciary duty by Defendant, who was at all relevant times Texaco's Vice President of Human Resources and the Plan Administrator for Texaco's employee benefit plans. (Def.'s Local Rule 56.1 Statement ¶¶ 2–3 and evidence cited therein.) Asserting that they were wrongfully excluded from coverage under the Retirement Plan of Texaco, Inc. ("Retirement Plan") and the Employees Thrift Plan of Texaco, Inc. ("Thrift Plan" and, with the Retirement Plan, the "Plans"), and characterizing their cause of action as one pursuant to section 502(a)(3) of ERISA [2] for "other equitable relief" in

---

**1.** The Second Amended Complaint defines the putative class as "All citizens of the United States who, between January 1, 1990 and [date of certification], worked for Texaco, Inc., and/or one of its affiliates or subsidiaries, either directly or through an intermediary employment agency, for at least 1,000 hours during a 12–month period, and did not re- ceive employee benefits because they were classified as 'independent contractors,' 'temps', and/or 'leased employees'." *Id.* at ¶ 9. Motion practice with respect to class certification has not yet commenced.

**2.** 29 U.S.C.A. § 1132(a)(3) (West 1999).

respect of various alleged fiduciary breaches, they seek appointment of a new independent Plan Administrator, a declaration that the plaintiff class members are eligible for benefits under the Plans, and related relief. The individual plaintiffs also claim that they were denied plan documents in violation of relevant disclosure provisions of ERISA, and seek to recover statutory penalties pursuant to section 502(c) of ERISA.[3] The Court has jurisdiction of this action pursuant to 28 U.S.C. section 1331 and 29 U.S.C. section 1132(e).

By Amended Opinion and Order dated January 3, 2001, this Court (Parker, J.), dismissed Plaintiffs' Second Amended Complaint to the extent it asserted claims pursuant to ERISA section 502(a)(1)(B), ERISA section 510 and state law, dismissed Plaintiffs' claims against all defendants other than defendant Stoner, dismissed Plaintiff Criddle's ERISA section 502(c) claim, and denied the remainder of Defendants' motion, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the complaint. *See Schultz v. Texaco Inc.*, 127 F.Supp.2d 443 (S.D.N.Y.2001) (*"Schultz I"*). The case now comes before the Court on the parties' cross-motions for summary judgment on Plaintiffs' section 502(a)(3) and 502(c) claims and Plaintiffs' motion for leave to file and serve a Third Amended Complaint. The Court has considered carefully all of the parties' initial and supplemental submissions and heard oral argument. For the reasons that follow, Plaintiffs' summary judgment motion is denied in its entirety, Defendant's motion is granted in part, and Plaintiffs' motion to amend their complaint is granted in part.

## BACKGROUND

The following facts are undisputed except as otherwise indicated.

Plaintiff Alton C. Schultz, Jr. ("Schultz"), was initially employed by Texaco Exploration and Production, Inc. ("TEPI") in May 1991. From July 1991 through January 28, 1999, he continued to work at TEPI's facilities but was on the payroll of three third-party entities that were under contract with TEPI—Metro-Careers, Inc., from approximately 1991 to 1995, Kelly Services from approximately 1995 to 1998, and Professional Temporaries of New Orleans from approximately 1998 through the termination of the employment. Schultz was not offered benefits under Texaco's employee plans, unlike co-workers who were classified as Texaco "employees" and were afforded access to such benefits. (Schultz Aff. dated April 18, 2001 (Pls.' Ex. 1).)

Plaintiff Elaine B. Jackson ("Jackson") was initially employed by TEPI in or about October 1990 and was moved to the MetroCareers Inc. payroll in or about July 1991. Jackson asserts that she was told at the time that she "could no longer be an 'independent contractor' if [she] wanted to continue working for Texaco." (Jackson Aff. dated April 23, 2001 (Pls.' Ex. 2).) She thereafter worked in the "New Orleans Texaco Office" through sometime in early 1995. She was re-hired through Kelly Services in July 1996; Texaco changed the third-party payroll contract to Professional Temporaries of New Orleans in 1998. Jackson was " 'laid off' " by Texaco in February 1999. She was not afforded Texaco employee benefits while she was on the third-party payrolls. (*Id.*) Plaintiffs Gladys Criddle ("Criddle") and Harold J. Weber, Jr. ("Weber"), also worked at Texaco's New Orleans office under third-party contractor arrangements and were not afforded Texaco benefits. (Pls.' Exs. 3, 4). Weber had previously been employed by Texaco from 1966 to 1984. (Weber Aff.

---

**3.** 29 U.S.C.A. § 1132(c) (West 1999 & Supp. 2003).

dated May 1, 2001 (Pls.' Ex. 4).) Weber is eligible for benefits under the Retirement Plan in connection with the 1966–1984 Texaco employment. (*Id.;* Pls.' Ex. 10.)

Plaintiffs assert that they were not aware of any potentially viable claim that they could make for Texaco benefits until after they read of litigation relating to coverage under the benefit plans of another company, ARCO, in 1999. In the fall of 1999, Schultz initiated correspondence with Texaco, requesting information regarding his "rights" under various Texaco plans. (Ex. P to Aff. of Elise Bloom, dated April 30, 2001, in Supp. of Def.'s Mot. ("4/30/01 Bloom Aff.").) The ensuing series of letters culminated in a December 6, 1999 letter from defendant Stoner, as Plan Administrator, to Schultz, denying his claim for Texaco benefits and reading in pertinent part as follows:

> From the facts available to me, I have confirmed you were employed by Metro-Careers, Inc., Kelley Services, Inc., and Professional Temporaries USA, and provided your services to Texaco through these third parties pursuant to an agreement between the company and the third party. The eligibility provisions in all of Texaco's benefit plans include the following language, which explicitly excludes leased or third-party contract employees from coverage or participation:
> *The Plan Administrator has sole discretionary authority to determine whether you are an employee of the company or a participating company, based only on the plan's eligibility criteria, without regard to whether you are considered a common law employee of the company or a participating company for any other purpose.*
> *You are not eligible to join this plan if you are, in the sole discretion of the Plan Administrator, characterized or under a contract as an independent contractor or rendering services to the company pursuant to an agreement between the company or a participating company and a third party.*
> Therefore, in response to your inquiry, this will inform you that you are not entitled to any benefits under Texaco's benefit plans . . . .

(Ex. T to Bloom 4/30/01 Aff. (emph. original); *see also* Stoner Dep. at 105–106, 108–110.) Stoner responded in substantially identical fashion to an appeal by plaintiff Weber. (Ex. CC to 4/30/01 Bloom Aff.)

Plaintiff Jackson's initial inquiry was met with a letter from a Texaco Human Resources Manager that asserted that Jackson was not eligible for Texaco benefits because she was never an employee of Texaco or its subsidiaries but was, rather, employed by MetroCareers, Inc., Kelley Services, Inc., and Professional Temporaries USA. (Ex. DD to 4/30/01 Bloom Aff.) There is no evidence in the record indicating that plaintiff Jackson appealed this determination to the Plan Administrator. There is no evidence in the record indicating that plaintiff Criddle made any application for benefits.

The italicized language in Ms. Stoner's letters to Schultz and Weber was not drawn from the official, or formal, texts of the relevant Plan documents. Rather, Ms. Stoner quoted portions of the 1999 Summary Plan Description ("SPD") for the Retirement Plan. *Compare* Ex. G to 4/30/01 Bloom Aff. *with* Exs. T and DD to 4/30/01 Bloom Aff. The "Formal Text" for the Retirement Plan, as restated effective January 1, 1989 ("1989 Retirement Plan Text") defined "Employee" as "[a]ny individual employed by an Employer [ . . . including] leased employees within the meaning of section 414(n) of the [Internal Revenue] Code",[4] defined "Employer" as

---

4. 1989 Retirement Plan Text at 2.

"[t]he Company [Texaco, Inc.] or any Subsidiary or Affiliated Company to which the Plan from time to time may be applied," [5] and included an "Eligible Employee" definition that read in pertinent part as follows:

The Board of Directors of the Employer may, from time to time, designate as eligible Employees one or more classifications of its Employees.

Employees whose services are received by an Employer pursuant to a leasing agreement between the Employer and a third party shall not be deemed within a classification of eligible Employees.

(1989 Retirement Plan Text Art. II, ¶ 1(a), Ex. H to 4/30/01 Bloom Aff.) The 1989 Formal Text of the Employees Thrift Plan ("1989 Thrift Plan Text") read in pertinent part as follows:

The Board of Directors of any Participating Employer may, from time to time, designate as eligible employees one or more classifications of its employees. Employees whose services are received by a Participating Employer pursuant to a leasing agreement between the Participating Employer and a third party shall not be deemed within a classification of eligible employees.

(1989 Thrift Plan Text, Section II ¶ 1, Ex. N to 4/30/01 Bloom Aff.) Neither the 1989 Retirement Plan Text nor the 1989 Thrift Plan Text defined the term "leasing agreement."

The Retirement Plan was further amended and restated as of December 31, 1994 ("1994 Retirement Plan Text"). The 1994 document, which is the most recent formal iteration of the Plan's eligibility provisions that was proffered by the parties in connection with the instant motion practice, includes the following relevant definitional and participation provisions:

**Eligible Employee.** Any Employee who meets or can be expected to meet all the Plan's eligibility requirements ... before becoming a Member of the Plan.

**Employee.** Any individual who is employed by the Employer, including a Leased Employee, but excluding any individual characterized by or under contract with the Employer as an independent contractor.

**Employer.** The Company or any Subsidiary or Affiliated Company which adopts this Plan with the consent of the Company.

**Leased Employee.** Any individual defined in Section 414(n) of the [Internal Revenue] Code. Leased Employees do not include independent contractors or individuals who are not required to be treated as Employees under Section 414(n) of the Code and any applicable Regulations.

(1994 Retirement Plan Text, §§ 1.25, 1.30. 1.31, 1.46. (Pls.' Ex. 7.)) The plan text does not define the term "individual characterized by or under contract with the Employer as an independent contractor." The section titled "The Plan Administrator" provides in pertinent part as follows:

The Plan Administrator will have complete responsibility for the administration of the Plan, for the exclusive benefit of the Members ... subject to the specific terms of the Plan. The Plan Administrator will have the power and discretion to interpret and construe the terms of the Plan, to resolve any ambiguities and omissions in the Plan, and to determine all questions arising in connection with the administration, interpretation, and application of the Plan. All actions or determinations of the Plan Administrator will be final, conclusive and bind-

---

**5.** *Id.*

ing on all persons. In addition, the Plan Administrator is authorized to control the operation and administration of the Plan, including, but not limited to, the following: ...

(3) the discretion to determine all questions relating to the eligibility of Employees to become Members or remain Members and to receive benefits under the Plan;

(4) the final determination concerning claims for benefits; ... [and]

(5) compliance with all disclosure requirements imposed by state or federal law....

(*Id.*, § 20.04(B).) The Retirement Plan further allocates "responsibility to manage and control the assets of the Plan," including responsibility "to implement and monitor the funding policy set forth in ... the Plan," to the Plan's Financial Manager. (*Id.*, § 20.04(A).) Responsibility for "the approval of the Plan, including amendments to the Plan," is reserved to Texaco, acting through its Board. (*Id.* § 20.04(F).) "Plan" is defined, in pertinent part, as "The Retirement Plan of Texaco, Inc., as amended from time to time." (*Id.* § 1.62.)

The 1994 restatement of the Thrift Plan defines "Employee" as:

Any individual who is employed by the Employer, including a Leased Employee, but excluding any individual characterized by or under contract with the Employer as an independent contractor.

(Formal Text of the Employees Thrift Plan of Texaco, Inc., Restated as of December 31, 1994 ("1994 Thrift Plan Text") § 1.29, Pls.' Ex. 6.) The 1994 Thrift Plan Text's definition of "Leased Employee" is identical to that in the 1994 Retirement Plan text, and its provisions regarding the responsibilities of the Financial Manager and the Plan Administrator, and regarding plan amendments, are substantially identical to the 1994 Retirement Plan Text provisions quoted above. *See* 1994 Thrift Plan Text §§ 1.46, 17.04.

Neither party contends that the plaintiffs here were "Leased Employees" at any relevant time within the meaning of the above-quoted plan provisions.

Other SPDs issued by Texaco during the relevant period included the following eligibility provisions:

Employees who provide their services under a leasing agreement between the Company or a Participating Company and a third party are not eligible for membership in the Plan.

(1986 Retirement Plan SPD at 1, Ex. D to 4/30/01 Bloom Aff.)

You are not eligible to join this plan if you provide your services under a leasing agreement between Texaco or a participating company and a third party.

(1991 Retirement Plan SPD at 1, Ex. E to 4/30/01 Bloom Aff.)

You are not eligible to join this plan if you provide your services under an independent contract or a leasing agreement between Texaco or a participating company and a third party.

(1994 Retirement Plan SPD at 1, Ex. F to 4/30/01 Bloom Aff.)

Plaintiff Weber's November 9, 1999, letter to the Plan representative who communicated the initial denial of Weber's benefit claim included a request for a copy of the "Texaco Pension Plan." (Ex. X to 4/30/01 Bloom Aff.) On or about November 22, 1999, Weber was provided with a copy of a "Summary of the [Texaco] Retirement Plan." (Ex. Y to 4/30/01 Bloom Aff.) That summary, which appears to date from July 1983, does not appear to include any language relating to exclusion of employees working under third party contracts or leasing agreements. It generally recites that one is eligible to participate in the plan if "you are ... an employee of the

Company or of a subsidiary or affiliated company which has adopted this Plan, called 'participating companies,' ... [and] within a classification of employees designated as eligible for membership ·in this Plan by a participating company." (*Id.* at 1.) In a November 28, 1999 letter. to Ms. Stoner, Mr. Weber requested "complete copies of all Retirement Plans and amendments that were in effect for the period 7/83 through 3/99." (Ex. AA to 4/30/01 Bloom Aff.) Defendant Stoner's January 11, 2000, letter denying his benefit claim was accompanied by a copy of the 1994 Retirement Plan Text and subsequent formal amendments. (Ex. CC to 4/30/01 Bloom Aff.) There is no evidence that any of the other plaintiffs requested plan documentation from the Plan Administrator.

In determining that Plaintiffs Schultz and Weber were not entitled to Texaco plan benefits, Stoner considered the 1994 official plan texts and 1999 SPDs, spoke with in-house Texaco counsel, and generally considered the third-party arrangements pursuant to which Plaintiffs were employed. She reached the conclusion that the two were ineligible for benefits because they were "characterized ·as ... independent contractors" within the meaning of the Plan provisions quoted above. (Tr. of Stoner Dep. at 52–53, 58, 86 (Pls.' Ex. 5).) The record, which includes a transcript of Stoner's deposition testimony, provides no further elucidation of her reasoning or any detailed account of the nature or basis of her interpretation of the language of· the Plans. It is not clear whether the particular language Stoner indicates she construed was language from a formal plan text or from an SPD. There is no indication in the record that Stoner considered or construed the 1989 formal plan language, or any of the pre–1999 versions of the SPDs, in reaching her conclusions.

· Stoner asserts that she did not construe or rely on the "leased employee" language used in the plan texts and SPDs in connection with her eligibility determinations. '(Stoner. Tr: at 53.) Nor did she consider various factors, such as the location, supervision and direction of the Plaintiffs' work for Texaco, that Plaintiffs contend are relevant to "common law employee" status, in making her eligibility determinations. (Stoner Tr.· at 112–15.)

## · DISCUSSION

### Motions for Summary Judgment

### Summary Judgment Standard

Summary judgment shall be granted in favor of the moving party where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of· law." Fed.R.Civ.P. 56(c). When deciding whether to grant a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor." *Armstrong. v. Liberty Mutual Life Assurance .Co. of Boston,* 273 F.Supp.2d 395, 402 (S.D.N.Y.2003) (citing *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio· Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). "An issue of fact is genuine when 'a reasonable jury could return a verdict for the nonmoving party,' and facts are material to the outcome of the litigation if application of the relevant substantive law requires their determination." *Brody v. Enhance Reinsurance Co. Pension Plan,* No. 00 Civ. 9660(LAP),· 2003 WL 1213084, at *4 (S.D.N.Y. Mar.17, 2003) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91

L.Ed.2d 202 (1986)). The standard to be applied when deciding cross-motions for summary judgment "is the same as that for individual motions for summary judgment and the court must consider each motion independent of the other." *Aviall, Inc. v. Ryder Sys., Inc.*, 913 F.Supp. 826, 828 (S.D.N.Y.1996).

Here, each party asserts, on the basis of divergent views of the universe of material facts, that the case is ripe for summary judgment in its favor. Plaintiffs contend that the undisputed facts clearly show breaches of fiduciary duty and violations of disclosure requirements warranting equitable relief and penalties relating to the Retirement Plan and the Thrift Plan; Defendant Stoner argues that the section 502(a)(3) claim should be dismissed as time-barred or unavailable to Plaintiffs as a matter of law and that the claim in any event fails on its merits, and further asserts that any failure to respond timely to Plaintiff's Weber's request for plan documentation does not warrant the imposition of the discretionary statutory penalty.

*Statute of Limitations*

■ In *Schultz I*, Judge Parker denied Defendants' motion to dismiss Plaintiffs' ERISA section 502(a)(3)[6] claim as time-barred, holding that the factual issue of whether Plaintiffs had actual knowledge of the alleged breaches of duty within the three-year limitations period imposed by section 413(2) of ERISA[7] could not be resolved on a motion to dismiss the complaint. The undisputed aspects of the factual record proffered by the parties in connection with the instant motion practice establish that, although Plaintiffs were no doubt aware by the early 1990's that they

had been moved (or hired) into positions Texaco deemed ineligible for benefits, it was not until January 2000 or later that any of them received copies of the various plan documents and summary plan descriptions purportedly relied upon by Defendant Stoner in making her fiduciary determination regarding benefit eligibility. There is no evidence of any prior communication to Plaintiffs of the Plans' terms or any fiduciary's interpretation of them.

■ Under the law of this Circuit, [A] plaintiff has "actual knowledge of the breach or violation" within the meaning of ERISA § 413(2) ... [only] when he has knowledge of all material facts necessary to understand that an ERISA fiduciary has breached his or her duty or otherwise violated the Act.... While a plaintiff need not have knowledge of the relevant *law*, ... he must have knowledge of all facts necessary to constitute a claim.

*Caputo v. Pfizer*, 267 F.3d 181, 193 (2d Cir.2001). Furthermore, " '[t]he disclosure of a transaction that is not inherently a statutory breach of fiduciary duty ... cannot communicate the existence of an underlying breach.' " *Id.*

The failures to offer benefits of which Plaintiffs were aware in the 1990–1991 time frame were not inherently breaches of fiduciary duty, as it could have been the case that Plaintiffs had been excluded in accordance with plan terms. Thus, the exclusion did not, standing alone, communicate the existence of a breach of duty. The record before the Court indicates that Plaintiffs did not become aware of the terms of the plans—an essential factual

---

**6.** Section 502(a)(3) of ERISA authorizes plan participants, beneficiaries and fiduciaries to bring civil actions "(A) to enjoin any act or practice which violates any provision of this title [of ERISA] or the terms of the plan, or (B) to obtain other appropriate equitable re-

lief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan." 29 U.S.C.A. § 1132(a)(3) (West 1999).

**7.** 29 U.S.C.A. § 1113 (West 1999).

element of their claim—until 2000 or later, well within the three-year limitations period.

In light of the factual record before the Court, and because eligibility and administrative decisions relating to the potential scope of plan participation are necessarily governed by the terms of the applicable plans (*see also infra* pages 304–05), Defendant has failed to demonstrate that Plaintiffs had actual knowledge of the claimed breaches of fiduciary duty prior to their access to the relevant plan provisions. Their ERISA section 502(a)(3) claim is thus timely under ERISA section 413(2), and Defendants' motion for summary judgment on this basis is denied.

In light of the development of the record with respect to the specifics of the relevant plan provisions and the nature and timing of the actions of the Plan Administrator with respect to Plaintiffs' eligibility for Retirement Plan and Thrift Plan benefits, the Court will, if requested, entertain reargument and further briefing as to whether plaintiffs' claims under ERISA section 502(a)(1)(B) are time-barred.

*"Overlap" of Fiduciary Breach Claims with ERISA § 502(a)(1)(B) Claims*

Defendant renews her argument that Plaintiffs' claims pursuant to ERISA section 502(a)(3) should be dismissed as duplicative of the ERISA section 502(a)(1)(B) [8] claim for benefits that was also asserted in the Second Amended Complaint. Judge Parker rejected this categorical preclusion argument in *Schultz I*, holding that the viability of the section 502(a)(3) claim should await further development of the record. *Schultz I*, 127 F.Supp.2d at 451.

The record as developed on these motions indicates that Plaintiffs' fiduciary breach claims are not entirely co-extensive with their section 502(a)(1)(B) claim.

Defendant's argument is focused on the Supreme Court's decision in *Varity v. Howe*, 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996), in which the Court, while holding that "other equitable relief" under ERISA section 502(a)(3) can be available to individual participants and beneficiaries as a "safety net," observed that, "where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be appropriate." 116 S.Ct. at 1079. Stoner argues that Plaintiffs, who principally seek plan benefits, have an adequate benefit recovery remedy under section 502(a)(1)(B) and cannot "repackage" their benefit claims as ones for breach of duty and equitable relief under section 502(a)(3).

Plaintiffs argue that Stoner breached her fiduciary duty by failing to identify them and those similarly situated as eligible participants and that the wrongful failure to offer enrollment also constituted and resulted in breaches of fiduciary duty. Plaintiffs seek: the appointment of an independent fiduciary to make new eligibility determinations and calculate any losses accruing to the Plans by reason of prior failures to identify eligible participants and collect contributions attributable to those participants; a declaration of their eligibility for Retirement and Thrift Plan benefits; an order requiring Stoner to make restitution to the Plans for their losses; and attorneys fees, costs and other relief. (Pls.' Mem. in Opp. at 25.) The eligibility declaration sought by Plaintiffs overlaps precisely the personal benefit remedy pro-

---

8. ERISA section 502(a)(1)(B) permits a participant or beneficiary to sue "to recover benefits due him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]" 29 U.S.C.A. § 1132(a)(1)(B) (West 1999).

vided to individual plan participants under section 502(a)(1)(B). Plaintiffs' section 502(a)(3) action is precluded to that extent by the existence of an adequate remedial vehicle in section 502(a)(1)(B).

▮ Plaintiffs are also, however, attacking the administration of the Plans on a broad basis, alleging pervasive failure to consider the eligibility of entire classes of potential participants and related failures to comply with various ERISA-imposed duties.[9] The provisions of section 502(a)(3), which authorizes "a participant, beneficiary, or fiduciary" to sue "to obtain other appropriate equitable relief (i) to redress ... violations [of ERISA's employee benefit rights provisions] or (ii) to enforce any [such ERISA] provisions or the terms of the plan," encompass the plan-wide relief, such as appointment of an independent fiduciary, that Plaintiffs seek. *See Marshall v. Snyder*, 572 F.2d 894, 901 (2d Cir.1978) (construing ERISA sections 409 and 502(a)(5), which authorizes suits by the Secretary of Labor for "other equitable relief," to authorize appointment of receiver in connection with action to remedy fiduciary breach). Section 502(a)(3) does not distinguish among fiduciaries, participants and beneficiaries in authorizing actions for such "other equitable" relief.[10] Indeed, it may be that a participant or beneficiary is the party best suited to pursue relief protective of the plan in the event fiduciaries are in broad violation of the provisions of ERISA or of the plan.

Stoner cites a number of decisions as holding categorically that participants who could bring section 501(a)(1)(B) actions cannot seek section 502(a)(3) relief. The Court is not persuaded that the import of *Varity's* "adequate remedy" instruction is that broad or, indeed, that the holdings of many of the lower court cases Defendant cites support such categorical preclusion. Stoner relies chiefly on *Montesano v. Xerox Corp. Retirement Income Guarantee Plan*, 256 F.3d 86 (2d Cir.2001), in which the Second Circuit affirmed a district court decision granting judgment to Xerox on a claim that the company had wrongfully excluded workers who had provided their services to Xerox under third-party contracts. After determining that the plaintiff's claim for denial of benefits was without merit because the fiduciary's interpretation of the relevant plan was not arbitrary or capricious, the district court had rejected the plaintiffs' section 502(a)(3) claim, holding that *Varity* only authorizes a section 502(a)(3) claim "where an individual does not have a claim for benefits under section 502(a)(1)(B)." *Montesano v. Xerox Corp. Retirement Income Guarantee Plan*, 117 F.Supp.2d 147, 166 (D.Conn. 2000). The Second Circuit affirmed, "for substantially the reasons stated by the district court." 256 F.3d at 88.

The Court does not read the *Montesano* affirmance as conclusive of Plaintiffs' section 502(a)(3) claim. As noted, the *Montesano* district court had already upheld

---

9. Plaintiffs assert that Stoner breached her fiduciary duties by, among other things: failing to make any attempt to identify and enroll eligible participants in order to ensure that the Plans received all contributions to which they were entitled; failing to act in accordance with Plan documents; and providing participants with inaccurate and misleading SPDs.

10. To the extent Defendant argues that Plaintiffs' desired equitable remedies are more properly sought under section 502(a)(2) rather than section 502(a)(3) (Def. Reply Mem. in Further Supp. at n. 1), the distinction is not material here, as the Second Amended Complaint cites ERISA section 409, which is enforced through section 502(a)(2), and the same statute of limitations applies to both. Second Amended Complaint ¶ 120; ERISA § 413, 29 U.S.C.A. § 1113 (West 1999). *See also Schultz I*, 127 F.Supp.2d at 446.

the challenged eligibility decision, thus clearly precluding on the merits any section 502(a)(3) claim that the determination was in breach of the administrator's fiduciary duty. The holding as to the scope of section 502(a)(3) thus was not essential to the district court's analysis of the viability of the claim. The underlying factual basis of the section 502(a)(3) claim in *Montesano* also appears to have been narrower than that here. The record in *Montesano* indicated that the administrator had performed a careful analysis of the relevant facts and plan language in reaching her decision. *Montesano*, 117 F.Supp.2d at 152–55. Here, by contrast, Plaintiffs contend that the administrator failed to take necessary affirmative steps to administer plan texts or legal provisions, in making determinations as to enrollment and other administrative practices under the plans, and in making the determinations challenged here. Similarly, while the Sixth Circuit concluded in *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609, 615 (6th Cir.1998), that a plaintiff seeking disability benefits had no section 502(a)(3) cause of action, it did so only after recognizing that the district court had upheld the plan administrator's decision on the benefit claim. "Therefore," the Sixth Circuit reasoned, "we conclude that [the administrator] reviewed Wilkins' claim fully and fairly, pursuant to section 1132(a)(1)(B), and, consequently, Wilkins has no cause of action for a breach of fiduciary duty under section 1132(a)(3)." *Id.* at 616. The plaintiff in *Wald v. Southwestern Bell*, 83 F.3d 1002 (8th Cir.1996), also cited by Defendant here, sought only section 502(a)(3) relief calculated to secure her personal benefits, and had, like the *Montesano* and *Wilkins* plaintiffs, failed to establish a wrongful denial of benefits on her section 502(a)(1)(B) claim. *See id.*, 83 F.3d at 1006–07.

Finally, nothing in the language of section 502(a)(3) or the Supreme Court's *Var-*

*ity* decision suggests that the possibility that broad-based corrective action could result incidentally in a plan's payment of benefits that might have been recoverable pursuant to 502(a)(1)(B) on an individual basis precludes a participant or beneficiary from seeking appropriate plan-wide equitable relief in connection with an assertion of breach of fiduciary duty. Defendant's motion is, accordingly, denied to the extent it seeks, on the basis of *Varity* preclusion, dismissal of Plaintiffs' claim for plan-based equitable relief for alleged breach of fiduciary duty in connection with the identification of potentially eligible plan participants.

*Standing*

■ Defendant, arguing that her eligibility determinations properly exclude Plaintiffs from participation in the plans, contends that Plaintiffs therefore have no standing as "participants or beneficiaries" to sue under ERISA's civil action provisions. Defendant's position is baseless as to Plaintiff Weber, who is entitled at a minimum to Retirement Plan benefits based on his pre–1990 Texaco employment. (Exs. U, W to 4/30/01 Bloom Aff.) Persons who have "a colorable claim" to vested benefits are "participants" within the meaning of the civil action provisions as well. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 117, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). The remaining named plaintiffs, who raise colorable arguments that their employment was covered by the eligibility provisions of the plans at issue, meet this standard.

*Section 502(a)(3) Claim—Arguments on the Merits*

To permit Plaintiffs to pursue the merits of their section 502(a)(3) claim is not, of course, to conclude that they are necessarily entitled to the relief they seek. Indeed, it may be that Plaintiffs have properly

been excluded from participation in the Retirement and Thrift Plans or that, even if Plaintiffs were not properly excluded, there was no breach of fiduciary duty. Accordingly, the Court now turns to those aspects of the pending motions that seek summary judgment on the merits of Plaintiffs' claim of breach of fiduciary duty.

Plaintiffs argue that they are entitled to summary judgment finding Stoner in breach of fiduciary duties to identify and communicate appropriately with them and other plan participants, as well as of related duties because, notwithstanding Plaintiffs' assignments to the payrolls of the various third-party agencies, they were common-law employees of Texaco and/or participating Texaco affiliates and were not otherwise excluded from the Retirement and Thrift Plans. Defendant does not appear, for purposes of the instant motion practice, to dispute Plaintiffs' assertion of common law employee status. Defendant disputes strenuously, however, the proposition that Plaintiffs were within an eligible class of plan participants while they were on the third-party payrolls.

Consistent with their assertion that they were entitled to participate in the Retirement and Thrift Plans despite their assignment to the third-party payrolls, Plaintiffs further contend that the defendant Plan Administrator had a fiduciary duty to analyzé Texaco's workforce and employment classification arrangements in order to identify all eligible employees (whether common-law or conventional) and breached that duty by not conducting such an analysis and making plan documentation and benefits available to Plaintiffs and all other

employees who would be eligible under Plaintiffs' reading of the Plans.

Defendant Stoner contends that there was no breach of duty because the Plans' terms excluded workers employed pursuant to third-party contracts, whether or not those workers were common-law employees or otherwise potentially eligible to participate.[11] Her interpretive position is based principally on language found in the 1999 Retirement and Thrift Plan SPDs and in the 1994 formal plan texts. Stoner posits that she is entitled to summary judgment on Plaintiffs' fiduciary breach claims because, exercising interpretive authority granted to her by the Plans, she reached an eligibility determination consistent with the Plans' terms that was neither arbitrary nor capricious. She further contends that there is no general duty of a plan administrator to audit the sponsoring employer's workforce to identify potentially eligible employees, that, in light of her appropriate interpretation of the coverage provisions of the plans, there was no breach of any related participant identification or communications duties, and that she cannot in any event be held liable for breach of any duty to seek and collect contributions because the Plans allocate financial responsibilities to a Financial Manager rather than to the Plan Administrator.

*Interpretation and Administration of Eligibility Provisions: Authority to Interpret Plans*

■■■ The Retirement Plan and the Thrift Plan both commit to the Plan Administrator "power and discretion to interpret and construe the terms of the particu-

---

**11.** Stoner denies having interpreted or relied upon, in considering Plaintiffs' assertion of participation rights, any plan provisions relating to exclusion of "Leased Employees" from plan participation in reaching the determinations communicated to Schultz and Weber.

The parties' arguments with respect to the significance of Internal Revenue Service pronouncements as to the meaning of that term are, accordingly inapposite and need not be addressed here.

lar Plan, to resolve any ambiguities and omissions in the Plan, and to determine all questions arising in connection with the administration, interpretation, and application of the Plan." The Plans further provide that "All actions or determinations of the Plan Administrator will be final, conclusive, and binding on all persons." (1994 Retirement Plan Text § 20.04(B); 1994 Thrift Plan Text § 17.04(B).) In light of these clear provisions granting interpretive discretion to the Plan Administrator, an arbitrary and capricious standard of review would normally be applicable to the administrator's benefit claim determinations. *Firestone Tire & Rubber*, 489 U.S. at 110–112, 109 S.Ct. 948.[12] Under this standard, a court can reverse the administrator's decision "only if it is without reason, unsupported by substantial evidence, or erroneous as a matter of law." *Burke v. Kodak Retirement Income Plan*, 336 F.3d 103, 110 (2d Cir.2003). Although the Supreme Court has not spoken directly to the standard applicable in fiduciary breach actions implicating the propriety of interpretations of benefit eligibility provisions, the Court suggested strongly in *Varity* that review through the fiduciary duty lens would not lessen the degree of deference to the administrator's determination:

> [C]haracterizing a denial of benefits as a breach of fiduciary duty does not necessarily change the standard a court would apply when reviewing the administrator's decision to deny benefits. After all, *Firestone*, which authorized deferential court review when the plan itself gives the administrator discretionary au-

thority, based its decision upon the same common-law trust doctrines that govern standards of fiduciary conduct.

*Varity*, 516 U.S. at 514–15, 116 S.Ct. 1065. Thus, a section 502(a)(3) challenge to an administrative decision predicated on a plan interpretation that participants claim is faulty does not nullify the terms of the plan granting the administrator the right and responsibility, in the first instance, to interpret the plan provisions or augment the court's power to supersede a determination made in the appropriate exercise of the administrator's authority.

Nor do ERISA's fiduciary provisions create a strict liability regime for erroneous legal or factual determinations. If anything, the requirement of proof of a breach of fiduciary duty may well put a greater burden of proof on the Plaintiffs than they would have faced in a simple section 502(a)(1)(B) claim for benefits, as Plaintiffs will have to prove a violation of the "prudent man" standard of care detailed in ERISA section 404(a). It is not necessary at this juncture to define the parameters of this burden of proof, however. As explained below, this case is not ripe for summary adjudication of the claims that are premised on Plaintiffs' interpretation of the plans' eligibility provisions.

### Plan Participation Under ERISA

As Plaintiffs acknowledge in their reply memorandum in support of their motion, ERISA does not require employee benefit plans to cover all of the sponsoring employer's common-law em-

---

**12.** Where, however, a fiduciary operates "under a conflict of interest, that conflict should be weighed in determining whether an abuse of discretion occurred." *O'Neil v. Retirement Plan for Salaried Employees of RKO General, Inc.*, 37 F.3d 55, 59 (2d Cir.1994). On the basis of evidence concerning, *inter alia*, stock-based elements of Stoner's compensation package, and her consultations with Texaco's in-house counsel in reviewing Plaintiffs' benefit claims, Plaintiffs argue that Stoner's determination is not entitled to deference due to a conflict of interest. Stoner denies that any improper interests influenced her decision. There are clearly disputed issues of material fact as to whether Stoner operated under a conflict in making her decisions.

ployees. (Pls.' Reply Br. in Supp. at 3.) Nor does ERISA prohibit employers from distinguishing among groups of employees as to coverage, as long as certain minimum age and service requirements are not exceeded with respect to the covered group(s). *See Bronk v. Mountain States Telephone & Telegraph, Inc.,* 140 F.3d 1335, 1338 (10th Cir.1998); *Wolf v. Coca–Cola Co.,* 200 F.3d 1337, 1342 (11th Cir. 2000); ERISA § 202(a), 29 U.S.C.A. § 1052(a) (West 1999).[13] Thus, the first step of an analysis as to whether the Plan Administrator has carried out appropriately her duties in connection with the enrollment of employees and provision of appropriate benefits is interpretation of the eligibility provisions of the plans. *See id.* As explained above, the plans at issue here commit interpretive issues to the Plan Administrator in the first instance. For the following reasons, the Court finds that neither party is entitled to summary judgment at this juncture, and the question of whether Plaintiffs are within the scope of the Plans' eligibility provisions will be remanded to the current Plan Administrator for further consideration.

*Governing Plan Documents*

ERISA requires that employee benefit plans be established and maintained pursuant to a written instrument. ERISA § 402(a)(1), 29 U.S.C.A. § 1102(a)(1) (West 1999). As part of the "prudent man" standard of care imposed by the statute, plan fiduciaries are required to perform their duties "in accordance with the documents and instruments governing the plan." ERISA § 404(a)(2), 29 U.S.C.A. § 1104(a)(2) (West 1999). Although Stoner testified in her deposition that she considered both the formal plan texts and the 1999 SPD language,[14] her claim rejection letters to Schultz and Weber quoted SPD language purporting to exclude persons "rendering services to the company pursuant to an agreement between the company or a participating company and a third party" as stating the governing terms of the plans. Stoner argues here that the SPD terms are conclusive of Plaintiffs' eligibility claims and should be recognized as the governing plan documents.

The 1999 SPD language relied upon by Stoner differs from the formal plan texts in several respects. Unlike the formal texts, it provides specifically for the exclusion of persons "rendering services to the company pursuant to an agreement between the company or a participating company and a third party"[15] and could be read to indicate that characterization by the Plan Administrator, rather than by the Employer, as an "independent contractor" is determinative of whether a person is excluded from participation on that basis. The 1999 SPD language Stoner quoted in

**13.** Plaintiff argues that eligibility criteria tied to discretionary designations of employees to covered and non-covered groups violate ERISA where there is no objective business justification, citing principally to Internal Revenue Service interpretations of employee benefit plan-related provisions of the Internal Revenue Code. Because the record is not yet fully developed as to which, if any, relevant groups of Texaco workers are excluded under the plans' eligibility criteria or as to any business reasons for Texaco's choice and application of the eligibility criteria, consideration of whether the plan provisions at issue here could, by their design, implicate fiduciary breach issues is premature. The Court notes in this connection, however, that many of the IRS agency pronouncements and regulations cited by Plaintiffs in this connection deal with Code provisions, such as the minimum coverage provisions of section 410(b) of the Internal Revenue Code, that have no specific ERISA analogues and thus are not authoritative for ERISA interpretation purposes. *See* ERISA § 3002(c), 29 U.S.C.A. § 1202(c) (West 1999); 29 C.F.R. § 2530.200a–2.

**14.** Stoner Tr. at, *e.g.,* 52, 58, 86, 106, 108.

**15.** 1999 Retirement Plan SPD at 2.

her letters to Schultz and Weber reads as follows:

You are not eligible to join this plan if you are, in the sole discretion of the Plan Administrator, characterized or under contract as an independent contractor or rendering services to the company pursuant to an agreement between the company or a participating company and a third party.

(1999 Retirement Plan SPD at 2; Exs. T and CC to 4/30/01 Bloom Aff.)

The 1994 formal plan language, by contrast, does not refer to contracts with third parties and speaks of the exclusion of "any individual characterized *by* or under contract with *the Employer* as an independent contractor"; the formal texts' provisions concerning the Plan Administrator's discretion refer to interpretation and construction of provisions of the Plan rather than characterization of the employment status of particular persons. (1994 Retirement Plan Text §§ 1.30 (emphasis added), 20.04(B); 1994 Thrift Plan Text §§ 1.29, 17.04(B).)

Stoner has proffered no evidence of her consideration of these differences between the formal texts and the SPD language, nor is there any indication that she considered the 1989 plan texts, which were apparently in effect for several of the employment years in question here, or even the 1994 SPDs, in reaching the conclusion that Schultz and Weber were ineligible for benefits for their periods of employment under third-party contracts. Her letters simply purport to quote the Plans as "explicitly exclud[ing] ... third-party contract employees from coverage or participation." [16] Her deposition testimony sheds little light on the legal or factual basis of her decision; she variously explained her interpretation of the plans' formal language as follows:

The individuals ... were employed by agencies that had a relationship with Texaco and it's my interpretation that those individuals were thus characterized by, and therefore excluded from the Plans, as they were employees of the agencies. [Stoner Tr. at 52–53];

In the situation of Mr. Schultz and Mr. Weber, there was a relationship between Texaco and the firm that employed them and I interpreted that to be an individual then characterized by. [*Id.* at 58]; and

Mr. Schultz was employed by MetroCareers or various third parties and those third parties had a relationship with Texaco. Therefore, that is an individual characterized by an independent contract in the language in the definition of employee. [*Id.* at 86.]

Stoner argues that her determination as to Plaintiffs' eligibility warrants deference by this Court because the SPD language is consistent with the 1994 formal plan text language excluding persons "characterized by or under contract with the Employer as an independent contractor" and that, if there is an inconsistency, Second Circuit authority requires this court to find that the SPD language is the definitive text. The record is insufficient to enable the Court to make a determination on the former proposition, and the Court rejects the latter.

The third-party contract exclusion in the SPDs is not conclusive of the eligibility of third-party contract workers to participate in the Plans or the propriety of her interpretive decision. The formal texts clearly contemplate reference to their terms as authoritative, defining "The Plan" by reference to the titles of the formal plan documents, "as amended from time to time" (1994 Retirement Plan Text § 1.62; 1989 Retirement Plan Text Art. I; 1994

---

16. Exs. T and CC to 4/30/01 Bloom Aff.

Thrift Plan Text § 1.53; 1989 Thrift Plan Text § I, ¶ 2.) The SPD itself recites that, "[i]n the event of any conflict between the Summary Plan Description and the Formal Text of the Retirement Plan of Texaco, Inc., the more detailed provisions of the Formal Text control." (1999 Retirement Plan SPD at iv.) There is no evidence that the eligibility language in the SPD was adopted pursuant to the plans' amendment procedures as a modification of the official texts at any relevant time. Accordingly, the relevant plan documentation is itself inconsistent with Defendant's focus on the SPD language as determinative of Plaintiffs' rights. In light of the inconsistencies between the documents, the SPD cannot be considered the definitive text.

Defendant cites a number of cases, some from this Circuit, upholding SPD language as definitive in disputes regarding the terms of ERISA-governed plans. Careful examination of those cases reveals, however, that in many of them there was no conflict between the formal plan text and SPD language (indeed, in some, there was no formal plan text at all) and that, where conflicts were found and the SPD was found to govern, the SPD language was more favorable to the participant than the official plan language and the participant had suffered prejudice by reason of reliance on the SPD. *See, e.g., Moriarity v. United Tech. Corp. Represented Employees Retirement Plan,* 158 F.3d 157, 160–61 (2d Cir.1998) (SPD could not reasonably be read to conflict with eligibility limitation in formal plan document that was not highlighted in SPD); *Heidgerd v. Olin Corp.,* 906 F.2d 903 (2d Cir.1990) (benefit eligibility provisions of severance plan SPD distributed to employees and filed with Department of Labor held to govern over more restrictive provisions of official docu-

ment not filed with Department of Labor or distributed to employees); *Moore v. Metropolitan Life Ins. Co.,* 856 F.2d 488 (2d Cir.1988) (restrictive language at issue appeared in both formal plan documents and SPDs for medical benefit plan; other informal communications held ineffective to modify it). *Cf. Shaw v. Connecticut General Life Ins. Co.,* 353 F.3d 1276, 1284 (11th Cir.2003) (rejecting SPD-based argument that plan administrator had interpretive discretion, "in the absence of any evidence showing that the plan was properly amended"); *Bergt v. Retirement Plan for Pilots Employed by MarkAir, Inc.,* 293 F.3d 1139, 1144–45 (9th Cir.2002) (while SPD is a plan document, unambiguous provision of master plan document that is more favorable to the employee controls "despite contrary unambiguous provisions in the SPD").

These decisions are consistent with ERISA's policy requiring accurate plan communications to employees and placing the burden on plan sponsors and/or fiduciaries to the extent inaccuracies in communications prejudice the rights of plan participants. *See Burke v. Kodak Retirement Income Plan,* 336 F.3d at 113 ("In shaping the contours of prejudice, we are sensitive to the general benefits and burdens imposed by ERISA's SPD requirement. The statute and the [U.S. Department of Labor] regulations place the burden on employers to draft an SPD that is accurate, comprehensible, and clear regarding restrictions on eligibility for benefits.... The consequences of an inaccurate SPD must be placed on the employer. The individual employee is powerless to affect the drafting and less equipped to absorb the financial hardship of the employer's errors.").[17] None of the cases

---

17. *See also Bergt,* 293 F.3d at 1145 ("The plan master document is the main document that specifies the terms of the plan, and employees

should be entitled to rely on its unambiguous provisions. The SPD, on the other hand, should simply summarize the relevant por-

cited by Defendant holds that a plan or fiduciary can invoke narrow or inconsistent SPD language to preclude participants from exercising rights granted by formal plan texts. Indeed, a panel of the Second Circuit recently recognized the absence of authority on this point in an unpublished decision: "In cases of conflict between the terms of an SPD and the Plan itself, we have found that the SPD controls.... It is not clear, however, that this principle applies where, as here, the SPD is being used as a sword rather than a shield." *Camarda v. Pan American World Airways, Inc.*, 162 F.3d 1147, 1998 WL 639300 (2d Cir. Feb.9, 1998) (citations omitted). Here, if there is no textual or factual basis for finding that Plaintiffs' services were "received by an Employer pursuant to a leasing agreement between an Employer and a third party"[18] or that each Plaintiff was "characterized by ... the Employer as an independent contractor"[19] within the meaning of the formal plan documents adopted by Texaco, it would stand ERISA's participant-protective philosophy on its head to deny Plaintiffs benefits on the basis of the third-party contract language in the 1999 SPD, which was never distributed to Plaintiffs during the course of their employment[20] and which did not even exist for the bulk of the time period in question here. Furthermore, to hold categorically that an SPD which may well narrow the plans' original participation provisions supersedes the official plan text to the extent there is a conflict would be to permit plan sponsors

and fiduciaries to escape obligations undertaken in duly adopted plans by the simple expedient of disseminating more restrictive SPDs. Such a result would be entirely inconsistent with ERISA's requirements that SPDs be *accurate* and that plans be administered in accordance with their terms, including compliance with amendment procedures.

The underlying interpretive issues here must therefore be resolved by consideration and application of the formal plan texts that were in effect during the named Plaintiffs' third-party employment with Texaco. Defendant is entitled neither to summary judgment nor to deference on the current record because the record is insufficient to establish that she considered all of the relevant plan provisions or facts in reaching her decisions as to Plaintiffs' eligibility. Neither are Plaintiffs entitled to summary judgment on this record, as it is not yet clear whether Stoner's actions were factually or legally inconsistent with the governing plan documents. Nor do the undisputed material facts demonstrate unequivocally at this stage that any breach of fiduciary duty has occurred in the administration of the plans.

The parties' submissions in connection with Plaintiffs' motion to file a Third Amended Complaint indicate that Defendant Stoner has been succeeded as Plan Administrator. As explained below, the Court will grant the amendment application insofar as it seeks to substitute the current Plan Administrator for Stoner, to the extent Plaintiffs seek relief against the Plan Administrator in his or her official

---

tions of the plan master document.... [T]he law should provide as strong an incentive as possible for employers to write the SPDs so that they are consistent with the ERISA plan master documents, a relatively simple task.") (citations omitted).

**18.** 1989 Retirement Plan Text Art. II ¶ 1(a); 1989 Thrift Plan Text, § II ¶ 1.

**19.** 1994 Retirement Plan Text § 1.30; 1994 Thrift Plan Text § 1.29.

**20.** June 26, 2003, Letter to Court from Defendant's Atty at 6.

capacity. Because, under the plans, interpretation of disputed provisions is for the Plan Administrator in the first instance, the Court will remand this matter to the current Plan Administrator for a determination of the eligibility issue in question. Following that determination, the Court will consider further evidence and arguments relevant to the merits of the determination and the appropriate standard of review.

### Breach of Duty to Collect Contributions

 Defendant Stoner is entitled to summary judgment to the extent Plaintiffs' section 502(a)(3) claim is premised on a failure to collect plan contributions attributable to benefits for Plaintiffs and persons similarly situated. Whether or not Plaintiffs' interpretation of the eligibility provisions of the Plans is correct, the terms of the Plans themselves make it clear that the Plans' Financial Manager, not the Plan Administrator, has responsibility for the Plans' financial affairs. (1994 Retirement Plan Text § 20.04(A); 1994 Thrift Plan Text § 17.04(A).) Stoner disclaimed any responsibility for the Plans' finances in her deposition testimony, and there is no evidence of record from which a reasonable fact finder could conclude that Stoner was a fiduciary with respect to the collection of contributions for the plans. Accordingly, Stoner's motion for summary judgment is granted with respect to the contribution collection aspect of Plaintiffs' section 502(a)(3) claim.

### Section 502(c) Claim for Disclosure Penalties

 Defendant seeks summary judgment with respect to Plaintiffs' ERISA section 502(c) claim. Plaintiffs assert that they are entitled to statutory penalties under section 502(c) of ERISA, arguing that Stoner failed to provide them with plan documentation as required by ERISA. Section 502(c) provides that

> [a]ny administrator ... who fails or refuses to comply with a request for any information which such administrator is required by this title to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) ... within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 per day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

29 U.S.C.A. § 1132(c) (West 1999).

It is undisputed that Plaintiffs Schultz and Jackson never requested plan documentation from the Plan Administrator. Stoner is therefore entitled to summary judgment dismissing their section 502(c) claims. It is also undisputed that Plaintiff Weber, on the other hand, requested in a November 9, 1999 letter that an administrator provide him with "a copy of the Texaco Pension Plan," that he was provided with a summary document (apparently dating from 1983) on or about November 22, 1999, and that he made the following additional request to Stoner by letter dated November 28, 1999:

> [P]lease provide me with a complete copy of the 7/83 Retirement Plan (including the Formal Text). Additionally, if the 7/83 Plan has been amended or replaced by a later plan, or plans, I hereby request that you also provide me with complete copies of all plans and amendments (and Formal Test [sic] or whatever name you may call it) that were in place since the 7/83 plan.
>
> Let me reiterate my request by stating that the purpose of this letter is to request complete copies of all Retirement Plans and amendments that were in effect for the period 7/83 through 3/99. If

you cannot comply with this request I ask that you provide me with a written reason for denying my request.

(Ex. AA to 4/30/01 Bloom Aff.; *see also* Exs. X and Y to 4/30/01 Bloom Aff.) It appears that copies of the 1994 Retirement Plan Text and subsequent amendments were provided to Weber with Stoner's January 11, 2000 letter denying Weber's claim. (Ex. CC to 4/30/01 Bloom Aff.) It is not clear when the 1989 document and the various SPDs were supplied to Weber. As Stoner and her delegees clearly took more than the statutorily-allotted 30 days to provide Weber with the bulk of the requested information, the Court will deny Defendant's motion for summary judgment on Weber's section 502(c) claim.

*Motion for Leave to file Third Amended Complaint*

 Plaintiffs move for leave to file a third amended complaint. The proposed amendment would add Peter J. Stathis, who has apparently succeeded Stoner as administrator of the plans at issue in this case, as a defendant, and would also add a number of factual allegations in connection with all of Plaintiffs' claims, including claims that were dismissed in *Schultz I*. Plaintiffs represent that they only wish to add Stathis as a relief defendant so that there is an appropriate recipient of any injunctive or other equitable direction from the Court in the event they are successful on their section 502(a)(3) claim, and that they are not seeking to assert any cause of action against him for personal liability. (Pls.' Mem. in Supp. at 1.) As to the additional factual allegations, Plaintiffs stated at oral argument that they are not seeking to reopen any of the matters determined by Judge Parker in *Schultz I* but, rather, are seeking to make a "complete" record for appeal.

Plaintiffs will be permitted to add the current Plan Administrator as a defendant, solely to the extent relief is sought against the Plan Administrator in his or her official capacity.

The motion is denied in all other respects. Plaintiffs have offered no authority for the proposition that it would be appropriate for an appellate court to review a dismissal order in light of allegations that were not before the trial court, and this Court is aware of no such authority. Nor does it appear that Plaintiffs ever requested leave to replead those allegations in connection with the litigation of the motion to dismiss or any application for reconsideration of the decision on the motion to dismiss. Insofar as the additional factual allegations relate to Plaintiffs' claims that survive the instant summary judgment motion practice, the denial of leave to amend is without prejudice to later renewal of the application.

Plaintiffs shall file and serve a revised third amended complaint consistent with this resolution of their motion, within twenty-one days from the date hereof.

### SUMMARY OF CONCLUSIONS

For the foregoing reasons, Plaintiffs' motion for summary judgment is denied in its entirety. Defendant is granted partial summary judgment as to the following claims:

1) Claim pursuant to ERISA section 502(a)(3) for declaration of eligibility to participate in Retirement Plan and Thrift Plan;

2) Claim pursuant to ERISA section 502(a)(2) or 502(a)(3) for breach of duty to collect contributions to Retirement Plan and Thrift Plan; and

3) Claims of Plaintiffs Schultz and Jackson for relief under ERISA section 502(c).

Defendant's motion is denied in all other respects.

The issue of eligibility of the named Plaintiffs for benefits under the Retirement Plan and Thrift Plan with respect to periods during which they provided services to Texaco or its affiliates while on the payroll of a third-party entity is remanded to the current Plan Administrator for further consideration. The Plan Administrator shall report his determination to the parties and the Court in writing within 60 days from the date of this Opinion and Order.

Plaintiffs may file and serve a Third Amended Complaint substituting the current Plan Administrator for defendant Stoner to the extent claims are asserted against the Plan Administrator in his or her official capacity. Plaintiffs' motion for leave to file a Third Amended Complaint is denied in all other respects.

If Plaintiffs wish to reargue the question of whether their ERISA section 502(a)(1)(B) claims are time-barred, they shall consult with defense counsel pursuant to Rule 1.A.1 (Civil Matters) of the Individual Practices Rules of the undersigned. If the parties are not able to resolve the issue consensually, they shall jointly propose a schedule for reargument and additional briefing.

A pre-trial conference will be held before the undersigned on May 7, 2004 at 11:00 a.m. in Courtroom 444, Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York.

SO ORDERED.